Barry GOODRICH, Plaintiff–Appellant,

v.

John EVERETT, Individually,
Robin Curtis, Individually,
Defendants–Appellees.

No. 05–6091.

United States Court of Appeals,
Sixth Circuit.

Aug. 24, 2006.

BEFORE: BOGGS, Chief Judge, and
COLE, Circuit Judges; ROSEN, District

Judge.[*]

## OPINION

R. GUY COLE, Jr., Circuit Judge.

Plaintiff–Appellant Barry Goodrich sued Defendants–Appellees John Everett and Robin Curtis in their individual capacities under 42 U.S.C. § 1983 for allegedly using excessive force to arrest Goodrich in violation of his Fourth Amendment rights. The district court granted the defendants' motion for summary judgment on the grounds that they were entitled to qualified immunity. We **AFFIRM** the judgment of the district court.

## I.

On September 15, 2002, an altercation arose among Goodrich, his wife, and his stepson at the Goodriches' residence. Goodrich departed their residence in his van, and his wife followed behind in her car in an effort to get him to return home. After a short distance they stopped their vehicles and had a verbal altercation, which ended in Goodrich's wife following him back to his van, attempting to open each of the doors of the van, which Goodrich had locked, and then "disappear[ing] out of sight" behind the van and beating on the back of the van. After Goodrich's wife disappeared from his view, Goodrich drove away. He decided to drive around for about thirty minutes to "cool off" and then return home.

Meanwhile, unbeknownst to Goodrich, his wife was apparently knocked to the ground as he pulled away in his van, and she sustained a serious head injury requiring emergency medical attention. At some point during Goodrich's drive around the neighborhood to cool off, the Wilson County Sheriff's Department received a call for assistance near the Goodrichs' residence. Several officers, including defendants Everett and Curtis, arrived at the Goodrichs' residence and obtained information that led them to believe that Goodrich's wife had been thrown from a vehicle during a domestic dispute and sustained serious injuries, and determined that Goodrich was a suspect in the crime of domestic violence assault and/or aggravated assault. The defendants admit for the purposes of summary judgment Goodrich's assertion that he did not throw his wife out of the car.

Goodrich returned home to encounter numerous vehicles and officers from the Wilson County Sheriff's Department near his house. As he drove up to his house he was approached by Detective Pat Hamblen, also of the Wilson County Sheriff's Department. Detective Hamblen stated she wanted to ask Goodrich some questions, to which he agreed. Detective Hamblen then asked Goodrich to step out of his van, and Goodrich testified in his deposition that he responded to the effect of: "what do I need to step out of the van for? I said, have I been—have I committed a traffic violation or am I under arrest?" Goodrich testified that Detective Hamblen did not respond to his question, and that at that point another officer, later identified as Detective Freeman, "proceeded to yell, and he yelled in a very, very loud—loud tone, a threatening tone. And he said, if you don't get out of the van, you're going to be sorry." Goodrich testified that he was "shaken up" by Detective Freeman's statements because he interpreted the statement as a threat of physical harm, and because in his opinion the Wilson County Police Department is known for

being abusive, a reputation that the defendants dispute.

Goodrich admits to refusing to comply with the officers' requests to step out of the van. He claims that he "was never told that he was under arrest," was "never told why [he] was being questioned," and believed that "there was no reason for them to be asking [him] anything to begin with." Goodrich drove away from the scene, avoiding a roadblock of Sheriff's Department vehicles by driving through a neighbor's yard. He testified that his intent was to drive to the nearby police station for the city of Mount Juliet, where he grew up and where he trusted the local law enforcement, in order to "get to the bottom of what [was] going on," because he "felt like [he] could get some answers and [he] would be safe" at that station.

Goodrich proceeded to drive the two miles from his house to the Mount Juliet Municipal Building by the most direct route. Goodrich was followed by three Wilson County Sheriff's Department vehicles flashing their emergency lights. Goodrich refused to pull over in response to the flashing emergency lights, but obeyed the speed limit, stopped at stop signs, and used proper turn signals as he drove. On his way to the Mount Juliet station he saw two more police cars with flashing lights blocking an intersection, and avoided the roadblock by choosing a different street that led directly to the police station. Upon reaching the Mount Juliet Municipal Building, he parked his vehicle in the building's parking lot, exited the vehicle, and walked toward the front door of the Mount Juliet police station. Goodrich claims that once he arrived at the Mount Juliet police station, "it should have been obvious that [he] was surrendering." Goodrich denies that the officers ever said "stop," "you're under arrest," "hold it right there," or any other verbal warning after

Goodrich exited his vehicle. For the purposes of appealing the denial of summary judgment on the qualified immunity issue, the defendants admit Goodrich's version of these events.

The parties offer differing accounts of the ensuing physical take-down of Goodrich by the defendants. Goodrich testified in deposition that he was "body slammed to the ground on the aggregate concrete" by the defendants. Defendants admit only that Goodrich was "taken to the ground." Defendant Curtis testified that he took him down to the ground by running up behind him, grabbing him around the midsection, and falling forward. Everett testified that Curtis "approached [Goodrich] from his left-rear side and grabbed him around the waist and basically forced him to the ground," "sort of like a bear hug."

Goodrich testified that the defendants "pushed" his face down in a flower bed full of mulch, "as deep and as far as they could." The defendants deny that they pushed Goodrich's face into the mulch, but admit for the purposes of summary judgment that Goodrich's face "may have been forced into the mulch during the take down."

The parties agree that one of the officers used his knees against Goodrich's side. Goodrich testified that an officer "was kneeing [him] in the side until he broke [his] ribs." Everett testified that he placed his knee on Goodrich's left shoulder blade "to keep him from raising up or flaying [sic] at [the officers] with his arms."

Goodrich claimed that both defendants kicked him as he was held down, testifying that "they were kicking [him], and nudging their knees into my—into my sides while this was going on." The defendants do not admit to kicking Goodrich, but admit for purposes of summary judgment that "the Defendants' foot or feet may have made

contact with the Plaintiff's person during the course of subduing him for arrest." JA 105.

Detective Freeman, who was also present during Goodrich's take-down, testified in deposition that he grabbed Goodrich's legs after he was taken down until Everett and Curtis restrained Goodrich with handcuffs.

Goodrich testified that he "wasn't resisting arrest in any form or fashion other than not stopping for [the police]." For the purposes of summary judgment, Defendants admit that Goodrich was not resisting arrest. All parties also agree for the purposes of summary judgment that the officers had holstered their weapons when they approached Goodrich and that they did not fear for their safety.

Goodrich claims that the force used by the officers upon him resulted in breaking and dislocating his hip, breaking his rib, and tearing "all the skin off [his] knees." Everett's incident report states that Goodrich "had abrasions on both knees, on his head and a split lip." Goodrich's medical records reflect that he was admitted to the emergency room at University Medical Center on September 16, 2002 with a fractured and dislocated right hip, and with injury to his chest wall and right leg. He was transferred immediately to Vanderbilt University, where he underwent major surgery to treat his injuries.

Goodrich continues to take prescription anti-inflammatory and pain medications. He claims that doctors told him he will continue to have pain throughout his life from the injury. He also claims to have lost some of the movement in his hip. Because of his injury he no longer performs work on roof tops for his painting business or plays recreational basketball.

Goodrich sued Everett and Curtis in United States District Court for the Mid-

dle District of Tennessee, claiming the defendants violated his right to be free from excessive force as guaranteed by the Fourth Amendment. The defendants moved for summary judgment on the ground that they were protected by qualified immunity.

The district court applied the two-prong test for qualified immunity set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The court found that Goodrich's claim satisfied the first of the two prongs of qualified immunity analysis, because "a jury could conclude that the degree of force that the defendants used in tackling the plaintiff and subduing him for arrest was objectively unreasonable and excessive." The district court concluded, however, that Goodrich could not satisfy the second prong of the test because it was not "clearly established that taking a suspect to the ground, when that suspect engages in ambiguous conduct that may be consistent with surrender, constitutes excessive force." Accordingly, the district court granted the defendant's motion for summary judgment.

This timely appeal follows.

## II.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "When the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2005).

In evaluating a law enforcement agent's qualified immunity defense to an excessive

force claim, courts must engage in a two-step inquiry, asking first whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. If the court answers the first inquiry in the affirmative, it must then ask whether the right was "clearly established in a particularized sense (not as a broad general proposition)." *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

This court reviews a district court's grant of summary judgment on qualified immunity grounds *de novo*, assuming the truth of the plaintiff's evidence and construing all inferences from that evidence in the light most favorable to the plaintiff. *Ciminillo*, 434 F.3d at 464.

The Fourth Amendment guarantees a person the right to be free from unreasonable seizure of his person. U.S. Const. amend. IV. In effecting a seizure, law enforcement agents are authorized to use "some degree of physical coercion" without violating the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness of a particular seizure is evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Id.* Courts use an "objective reasonableness" standard, without regard to the underlying intent or motivation of the officer, and from the perspective of an officer on the scene making split-second judgments and without the advantage of 20/20 hindsight. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir.2004). Relevant factors to consider in evaluating what level of force is reasonable include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. These factors are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the "totality of the circumstances." *Ciminillo*, 434 F.3d at 467.

Goodrich stresses, and the defendants conceded for purposes of summary judgment, that he did not believe, at the time of his arrest, that he had assaulted his wife and was not even aware of her injury until after his arrest. Thus the "crime" that Goodrich had committed at the time of his arrest, from his perspective, was no more than disobeying what he perceived to be unlawful police commands to exit his vehicle and to pull over during the low-speed chase. Furthermore, from his perspective, he was not evading arrest, because he claims that he did not know that the police sought to arrest him and in any case was heading to a nearby police station where "it should have been obvious that [he] was surrendering."

The reasonableness of an officer's use of force, however, is evaluated not from the subjective perspective of the plaintiff but from the perspective of an objective officer. *Dunigan*, 390 F.3d at 493. Goodrich concedes that the officers had obtained information that led them reasonably to believe that Goodrich was a suspect for the crime of aggravated domestic assault, a violent offense. Thus the severity of the crime at issue here weighs in favor of the use of force in apprehending Goodrich.

Furthermore, Goodrich concedes that he did not obey the orders of Detectives Hamblen and Freeman to exit his van, and did not pull over in response to the flashing lights of five different law enforcement vehicles. He also admits that he evaded two police roadblocks in the course of their pursuit of him, one by driving over the front yard of a home. Goodrich never

claims that he communicated to the officers either before or during his arrest any of his subjective reasons for his failure to comply with these commands. Although Goodrich claims that his intentions should have been obvious once he drove into the Mount Juliet police station parking lot, he concedes that even upon pulling into the lot he did not address the Wilson County officers who had been pursuing him, but instead began walking away from them, albeit toward the door of the police station. A reasonable officer would have concluded that Goodrich's actions were at best ambiguous and could be interpreted as a continued attempt to evade arrest, and would have anticipated that Goodrich might again take flight.

Thus, given that a reasonable officer in the defendants' position would have suspected Goodrich of a violent crime and would have interpreted Goodrich's actions as an attempt to evade the police, a reasonable officer would not have considered the physical tackling of Goodrich to be an excessive use of force.

Nevertheless, Goodrich claims that excessive physical force was used to overpower him after he was on the ground. The prohibition against excessive force distinguishes between the amount of force that is reasonable before a subject is subdued and the amount of force, if any, that is reasonable after a subject is under police control. "[I]t is unreasonable and thus a violation of the Fourth Amendment for a police officer, acting under color of law, to use physical force on a citizen who has been arrested and restrained, who is securely under the control of the police, and who is not attempting to escape." *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir.1996). Thus, continuing to beat a "neutralized" suspect constitutes an unconstitutionally excessive use of force, *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir.2002), as does continuing to spray mace on a suspect who has already been blinded and incapacitated, *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994). *See also McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988) ("[O]ur court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line.").

Goodrich, however, has not presented evidence sufficient to create a genuine issue of material fact regarding whether the police continued to apply force after he was neutralized. Goodrich testified that one officer "was kneeing [him] in the side until he broke [his] ribs" and the other officer was "wrestling with [his] hands, and handcuffing [him]," and that "they were kicking me, and nudging their knees into my—into my sides while this was going on." Taking the evidence in the light most favorable to Goodrich, the kneeing and kicking occurred not when Goodrich was neutralized, but while the officers were handcuffing him. Even assuming that Goodrich had been incapacitated merely by the officers' tackling him, Goodrich presents no evidence that such a fact was clearly communicated to the officers in the midst of the take-down. Although Goodrich states that he was not resisting the officers during the take-down, this subjective intent to cooperate, absent any evidence that he clearly communicated that intent to the officers and given the totality of the circumstances that would suggest an opposite intent, is insufficient to overcome the "built-in measure of deference to the officer[s'] on-the-spot judgment about the level of force necessary." *See Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir.2002).

This case presents a clear contrast, for example, to *St. John v. Hickey*, 411 F.3d 762, 772 (6th Cir.2005), in which we rejected the defendants' qualified immunity defense where "there [was] no question that the arresting officers knew [the suspect]

had muscular dystrophy and was confined to a wheelchair." Given the appearance to a reasonable officer that Goodrich was capable of violence and inclined to flee, a reasonable officer could have believed that Goodrich might resist the officers with force even after being tackled, and could have reasonably believed that continued force was necessary to subdue him.

■ Goodrich's testimony is also insufficient to create a genuine issue of material fact regarding whether the shoving, kneeing, and kicking that occurred during his handcuffing were delivered with excessive force. Clearly, some force may be wildly disproportionate for the purpose of handcuffing a suspect, and may constitute excessive force regardless of whether a suspect has already been subdued. Goodrich's testimony, however, does not allege a level of force or brutality that a reasonable officer would consider excessive. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (internal citation omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205, 206, 121 S.Ct. 2151. Goodrich does not describe the force of the kicking or the manner in which the kicks were delivered. Although we draw all justifiable inferences in Goodrich's favor for purposes of summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Goodrich still bears the burden of setting forth specific facts showing that there is a genuine issue of material fact for trial, *id.* at 250, 106 S.Ct. 2505, and "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," *id.*

at 252, 106 S.Ct. 2505. Rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* Goodrich's ambiguous description of the pushing, shoving, and kicking he endured constitutes at best a scintilla of evidence, insufficient for a rational trier of fact to conclude that a reasonable officer would consider the force excessive. *Cf. Gaddis v. Redford Twp.*, 364 F.3d 763, 773–74 (6th Cir.2004) (concluding that ambiguity of poor-quality videotape raised "at most" a scintilla of evidence insufficient to survive summary judgment).

### III.

Because we conclude that no constitutional violation occurred, we do not reach the second prong of *Saucier*, which asks whether the violation was of a clearly established right. For the foregoing reasons, we AFFIRM the judgment of the district court.