# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-3785

_____

Marcus A. Blazek,

*Plaintiff - Appellee*,

v.

City of Iowa City; Dan Roth; State of Iowa, also known as The State of Iowa,

*Defendant*s,

Juan Santiago

*Defendant - Appellant.*

_____

No. 12-3786

_____

Marcus A. Blazek,

*Plaintiff - Appellee*,

v.

City of Iowa City,

*Defendant*,

Dan Roth,

*Defendant - Appellant*,

State of Iowa, also known as The State of Iowa; Juan Santiago,

*Defendant*s.

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: November 20, 2013
Filed: August 5, 2014

_____

Before WOLLMAN, COLLOTON, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Marcus Blazek sued Officers Juan Santiago and Dan Roth, the city of Iowa City, Iowa, and the State of Iowa, alleging constitutional violations pursuant to 42 U.S.C. § 1983 and state-law violations. The district court[1] denied the officers' motions for summary judgment on the basis of qualified immunity and denied the motion for summary judgment of Officer Roth and the City with respect to most of the state-law claims. The court also dismissed all claims against the State and negligence-based state-law claims against Roth and the City.

Santiago and Roth appeal the court's denial of their motion for summary judgment based on qualified immunity. We affirm that ruling, albeit on narrower grounds than those set forth in the district court's order. We lack jurisdiction over

_____

[1]The Honorable Ross A. Walters, United States Magistrate Judge for the Southern District of Iowa, sitting by consent of the parties pursuant to 28 U.S.C. § 636(c).

-2-

Roth's appeal of the district court's denial of summary judgment on the state-law claims.

## I.

We recite the facts in the light most favorable to Blazek. In February 2009, Blazek was the roommate of Richard Feldhacker, who was on federal parole. As a condition of Feldhacker's parole, he agreed to warrantless searches of his residence. Feldhacker had disclosed in earlier monthly reports to his probation officer that he had a roommate, but his most recent monthly reports had not named a roommate.

After Feldhacker failed a drug test, his parole officer requested that Officer Juan Santiago of the State of Iowa conduct a home check. Santiago was a High Risk Unit Parole/Probation Officer whose main duty was to conduct home checks. On February 24, 2009, around 6 p.m., Santiago arrived at Feldhacker's apartment. He observed lights on in the apartment, so he knocked on the door. Santiago says that he heard someone approach the door and saw someone look out the peephole. Santiago identified himself as "Probation." He avers that the person behind the door then ran away and that he promptly heard a toilet flush.

Santiago requested backup from the Iowa City Police Department. Officer Dan Roth arrived in response, just as the apartment manager was unlocking Feldhacker's door for Santiago. Santiago and Roth entered the apartment; Santiago led with his gun drawn. They encountered Blazek, who was walking out of the bathroom wearing only a towel. Santiago did not recognize Blazek, but he knew Blazek was not Feldhacker. According to Blazek, he never heard the knock at the door and did not look through the peephole or run away to flush the toilet.

The officers cleared the apartment, and all three men entered Blazek's bedroom. The officers asked Blazek to sit on his bed and to identify himself. Blazek

was "belligerent," refused to identify himself except as "the roommate," and would not stay seated as directed. According to the officers, Blazek smelled of alcohol, and Blazek acknowledges drinking one or two beers that evening.

Blazek asserts that Santiago was yelling at him and accusing him of flushing drugs down the toilet. According to Blazek, he eventually responded to Santiago's yelling by saying that perhaps he should talk to a lawyer. Blazek says that Santiago then grabbed his arm, twisted the arm up behind him, and threw him to the ground, while Roth jumped on him and handcuffed him. Blazek alleges that after he was handcuffed, the officers grabbed his arms and "jerked" him up onto his bed.

The officers left Blazek handcuffed and sitting on the bed while they searched the apartment. Blazek was then allowed to dress and leave the apartment. At the time, Blazek did not complain of pain. But the next day, after going to work, Blazek went to a doctor and was diagnosed with a separated shoulder and an ankle fracture, described as a "small chip fracture." Medical records from a later visit in May 2009 show a torn rotator cuff, and the district court reasoned that a jury could find that all of the injuries resulted from the force applied by Santiago and Roth.

Blazek sued, claiming the officers violated his Fourth Amendment rights by unlawfully seizing him and by using excessive force against him. The officers moved for summary judgment on the basis of qualified immunity, but the district court ruled that Blazek presented sufficient evidence, if believed, to prove that the officers violated his clearly established rights under the Fourth Amendment. The district court also denied a motion by Roth and the City for summary judgment on most of Blazek's state-law claims. The court dismissed two claims of negligent supervision and training against Roth and the City, and dismissed the State from the case entirely. Santiago and Roth appealed.

We have jurisdiction to review an interlocutory appeal of the denial of qualified immunity under the collateral order doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Qualified immunity shields a public official from liability for civil damages when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotations omitted). The officers are entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to Blazek, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We review a district court's qualified immunity determination *de novo* and may resolve the appeal under either prong of the analysis. *Id.* at 236.

II.

As the district court correctly summarized, it is undisputed that "Blazek was belligerent, initially would not respond to questions about his identity, and would not stay seated as directed, facts it should be noted which are not contradicted by Mr. Blazek in his affidavit." R. Doc. 46, at 16-17. It was therefore reasonable for the officers to detain and handcuff Blazek as part of their investigation into Feldhacker's alleged parole violation. *See United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (explaining that handcuffing "can be a reasonable precaution during a *Terry* stop to protect [officers'] safety and maintain the status quo").

Blazek contends, however, that Roth and Santiago used excessive force during the encounter. In his affidavit with numbered paragraphs, Blazek identifies at least two discrete uses of force by the officers:

17. . . . Officer Santiago grabbed my right arm, twisted it upward and behind my back and then threw me to the floor. Officer Roth then jumped on me and handcuffed me while both officers were holding me down.

18. After applying the handcuffs, Officers Santiago and Roth grabbed me by my arms and jerked me from the floor onto the mattress of my bed.

R. Doc. 23-3, at 6.

Taking the handcuffing maneuver first, the law did not clearly establish in February 2009 that the officers acted unconstitutionally. In 2002, one court described a handcuffing technique almost identical to this one—where an officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming"—as "a relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002). This court then rejected an excessive-force claim in 2006 where an officer "forcefully threw" the plaintiff to the ground, pinned him down, and placed his weight into the plaintiff's back before handcuffing him, *Wertish v. Krueger*, 433 F.3d 1062, 1068 (8th Cir. 2006) (Bye, J., concurring), even though the plaintiff—like Blazek in his version—was only "passively resistant." *Id*. at 1066-67 (majority opinion). The plaintiff in *Wertish* suffered only *de minimis* injury, but a reasonable officer could understand the decision to approve as reasonable the use of a forceful throw during handcuffing. Qualified immunity protects officers who used essentially the same maneuver in this case, even if it happened to cause more serious injury. *Cf. Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) (explaining that "[t]he governing rule should not turn on . . . unpredictable and fortuitous consequences of an officer's use of force").

Our decision in *Kukla v. Hulm*, 310 F.3d 1046 (8th Cir. 2002), is not sufficient to show that Santiago and Roth violated clearly established rights in handcuffing Blazek. The allegation in *Kukla* was that although the suspect "did not resist arrest," an officer "forced him against his truck, twisted his arm, and raised it high behind his back injuring his collar bone, shoulder, neck, and wrist." *Id*. at 1050. The suspect then claimed that the handcuffs applied by the officer "were so tight that they broke his wrist and were not loosened for fifteen minutes despite his repeated complaints." *Id*. The absence of any resistance and the use of handcuffs to break the suspect's wrist distinguish *Kukla* from Blazek's case. Especially where the use of force alleged here likely resides on the "hazy border between excessive and acceptable force," *Saucier v. Katz*, 533 U.S. 194, 206 (2001), we cannot conclude that only a "plainly incompetent" officer would have believed the force used to handcuff Blazek was constitutionally reasonable.[2]

---

[2]Cases from other circuits likewise suggest the absence of a clearly established prohibition on the officers' actions in handcuffing Blazek. *Goodrich v. Everett*, 193 F. App'x 551, 554, 556-57 (6th Cir. 2006) (rejecting excessive-force claim where officers allegedly kneed plaintiff in the side until they broke ribs and kicked plaintiff, where the "kneeing and kicking occurred not when Goodrich was neutralized, but while the officers were handcuffing him," and where plaintiff was not resisting but officers reasonably believed plaintiff might flee); *Jones v. York Cnty. Police Dep't*, 160 F. App'x 126, 134 (3d Cir. 2005) (per curiam) (rejecting excessive-force claim where plaintiff complained that officers threw him to the ground, roughly stepped on him, and handcuffed him); *Lee v. Hefner*, 136 F. App'x 807, 812-13 (6th Cir. 2005) (rejecting excessive-force claim where plaintiff alleged that officer forced him to the ground, placed a knee on his back, and used a wrist lock to handcuff him); *Liiv v. City of Coeur D'Alene*, 130 F. App'x 848, 851-52 (9th Cir. 2005) (rejecting excessive-force claim of plaintiff who engaged in "passive resistance" by refusing to stand up and was "thrown" to the ground when officer grabbed an arm, used his body weight against plaintiff, and pushed him "right down violently to the ground"); *Mason v. Lowndes Cnty. Sheriff's Dep't*, 106 F. App'x 203, 208 (5th Cir. 2004) (rejecting excessive-force claim where plaintiff alleged that officers slammed him to the floor and put a knee in his back); *Pullen v. Vandertuin*, No. 98-41473, 2000 WL 1056090, at *2 (5th Cir. July 17, 2000) (rejecting excessive-force claim where officer threw

In our view, the narrower scope of qualified immunity urged by the partial dissenting opinion would impose an unreasonable burden on the police officers and cannot be squared with the more robust version of the doctrine espoused recently by the Supreme Court. Blazek must show that "every reasonable official would have understood that what he is doing violates" a constitutional right, *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation omitted), and that the constitutional question was "beyond debate." *Id*.; *see Lane v. Franks*, 134 S. Ct. 2369, 2383 (2014); *Stanton*, 134 S. Ct. at 7. We must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (internal quotation and citation omitted).

It is clear in light of *Wertish* that if the officers had lifted the belligerent Blazek off his feet, thrown him to the ground, and jumped on his back to handcuff him, without causing the alleged injury to his ankle or shoulder, then the officers would have acted reasonably or at least be entitled to qualified immunity. But the partial dissent would hold that if Blazek instead had one foot planted on the floor, and the torque of the throw to the ground caused his ankle to twist and fracture, then the officers are subject to suit and liability for damages. Similarly, an awkward landing that caused a separated shoulder would trigger liability, but a smoother alighting that resulted in ordinary bruising would not. And if the throw had caused merely a sprained ankle with no fracture, then who knows? Immunity from suit and liability for damages would depend on whether a reviewing judge later decides that use of the forceful throw allowed in *Wertish* caused an unacceptable degree of injury. Qualified immunity is designed to free police officers from the risk of suit and liability based on such fine distinctions. One can debate the Fourth Amendment ruling in *Wertish*, *see* 433 F.3d at 1067-68 (Bye, J., concurring), but taking the decision as a given, it

plaintiff to the ground and stood on him to bring plaintiff under control, even accepting that plaintiff was not resisting arrest).

-8-

is unrealistic to expect a police officer, in the heat of the moment, to discern whether a particular ankle injury would result from a takedown or to plan a careful landing for the detainee's shoulder.

The same goes for the force applied to Blazek's arms during the handcuffing. A reasonable officer reading the annals of the federal courts in 2009 would know that the technique like that applied here—where an officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder"—was "a relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Rodriguez*, 280 F.3d at 1351. Blazek alleges that Santiago "grabbed [his] right arm, twisted it upward and behind [his] back." Yet the partial dissent would hold that if the detainee complains of no pain during the incident, but discovers later that otherwise permissible "twisting" of his arm upward and behind his back caused a tear in his rotator cuff, then the officers have violated a clearly established right and are subject to suit and liability for damages. It was not "beyond debate" in 2009 that the constitutionality of the officers' actions here depended on whether their use of a "common and ordinarily accepted" handcuffing method caused injury to the detainee's shoulder area.[3]

The officers' jerking of Blazek from the floor to his bed, however, presents a discrete use of force for consideration under the Fourth Amendment. At that point

---

[3]Two of the partial dissent's favored out-of-circuit cases do not even involve handcuffing. *See Morelli v. Webster*, 552 F.3d 12, 22-25 (1st Cir. 2009); *Robison v. Via*, 821 F.2d 913, 923-24 (2d Cir. 1987). The third—a decision whose unpublished status means that it provides little, if any, support for imposing liability based on clearly established law, *see Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (en banc)—involved a claim that officers kicked an arrestee in the ankle as part of a handcuffing encounter. *Minchella v. Bauman*, 72 F. App'x 405, 409-10 (6th Cir. 2003). These authorities fall well short of "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

in the encounter, Blazek was handcuffed and under control. In his telling, Blazek was not resisting and posed no threat to the officers. He was not suspected of any serious offense; he was detained only because he was present at Feldhacker's residence and would not stay seated and identify himself when questioned. Nonetheless, the officers allegedly "jerked" him up by the arms with sufficient force to cause serious injury to his shoulder area.

It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a "gratuitous and completely unnecessary act of violence" is unreasonable and violates the Fourth Amendment. *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir. 2006) (alteration omitted). Pepper spray administered in the face of a subdued arrestee, *id*., and handcuffs applied so tightly—despite repeated complaints of pain—that they broke the wrist of a compliant arrestee, *Kulka*, 310 F.3d at 1050, were known to violate the Fourth Amendment. There is no prior case involving Blazek's precise factual scenario, but he need not show that the "very action in question has previously been held unlawful" to overcome qualified immunity, as long as the unlawfulness was apparent in light of preexisting law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Reasonable officers surely could bring Blazek up from the floor in some manner after he was handcuffed, and officers are not required to treat detainees as gently as possible. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (no excessive force where officers "roughly pulled [arrestee] up to her feet during her arrest"); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1516 (10th Cir. 1995) (no excessive force where record showed that officers did not "yank" wrists of handcuffed arrestee with injured shoulder, but rather "lifted" or "raised" him from the floor). But Blazek's allegation is that the officers did more than lift him up roughly. If Blazek can prove at trial that he was subdued and compliant, but that the officers grabbed him by the arms and gratuitously "jerked" him from the floor onto the bed, using enough violent force to cause significant injury, then we agree with the district

-10-

court that a reasonable jury could find a violation of the Fourth Amendment. And the law was sufficiently developed to show that such a violation—allegedly involving unnecessary violence against a handcuffed and compliant detainee—would contravene clearly established law as of 2009.

*    *    *

For the foregoing reasons, the order of the district court denying the motions of Santiago and Roth for summary judgment based on qualified immunity is affirmed. Because our resolution of the qualified-immunity appeal does not necessarily resolve Blazek's state-law claims against Roth and the City, we lack jurisdiction to consider the portion of Roth's interlocutory appeal concerning those claims. *See Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1012 (8th Cir. 2003) (en banc).

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion insofar as it affirms the denial of qualified immunity to Officers Santiago and Roth for their act of jerking Blazek from the floor and dismisses the appeal of Blazek's state-law claims. However, I respectfully dissent from the court's decision to grant qualified immunity to the officers for their use of force to handcuff Blazek, which a reasonable jury could conclude caused a separated shoulder, a torn rotator cuff, and a fractured ankle.

Officers Santiago and Roth are entitled to qualified immunity for the force that they used to handcuff Blazek unless (1) the evidence, construed in the light most favorable to Blazek, establishes a violation of a constitutional or statutory right and (2) the right was clearly established at the time of the violation. *See Edwards v. Byrd*, 750 F.3d 728, 731-32 (8th Cir. 2014). The court rests its partial grant of qualified immunity on its conclusion that the constitutional right implicated by Blazek's handcuffing was not clearly established at the time of the incident. *Ante* at 6-9. I

-11-

respectfully disagree.  Because I believe that a reasonable jury could find that the officers violated the Fourth Amendment when handcuffing Blazek and because this constitutional right was clearly established, I would affirm the denial of qualified immunity for the officers' use of force in its entirety.

The Fourth Amendment permits an officer to use "some degree of physical coercion or threat thereof" to effect an arrest or investigatory stop.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Applying this directive in the context of handcuffing, this court has recognized that "[h]andcuffing inevitably involves some use of force, and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (internal citation and quotation marks omitted).  Even so, an officer who uses an objectively unreasonable amount of force to handcuff a suspect violates the Fourth Amendment.  *See Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998).  Whether force is objectively reasonable depends on the totality of the circumstances, including the threat that the suspect poses to the officers or others, the severity of the crime at issue, and whether the suspect is actively resisting arrest or attempting to flee.  *Graham*, 490 U.S. at 396.  We also may consider the degree of any resulting injury, *Mann v. Yarnell*, 497 F.3d 822, 826 (8th Cir. 2007), because the severity of a suspect's injury is indicative of the amount and type of force used, *Chambers*, 641 F.3d at 906.

A reasonable jury could conclude that the force employed by Officers Santiago and Roth to handcuff Blazek was objectively unreasonable.  Beginning with the circumstances confronted by the officers, for purposes of summary judgment, Officer Santiago had no basis to suspect that Blazek had committed a crime.  To be sure, Officer Santiago testified about his suspicion that someone in the apartment had flushed drugs down the toilet, but Blazek specifically disputes the facts underlying this suspicion.  Blazek, who was the only person in the apartment, asserts that he was in the shower and did not flush the toilet or hear Officer Santiago knocking on the

front door. Viewing the facts in the light most favorable to Blazek, it cannot be said that Officer Santiago saw an individual look through the peephole of the front door, heard that individual run away from the door, and promptly heard a toilet flush. *See Stoner v. Watlingten*, 735 F.3d 799, 803 (8th Cir. 2013). While a jury could credit Officer Santiago's narrative, for purposes of summary judgment, we must assume that Officer Santiago had no basis to suspect Blazek of any wrongdoing. *See id.*

Nor was there a meaningful basis to suspect that Blazek posed a danger to the officers. Blazek was clad in a bath towel throughout the encounter with the officers, essentially eliminating any likelihood that he was carrying a weapon. Blazek, it must be noted, was not fully responsive to questions about his identity or compliant with Officer Santiago's orders to remain seated. The court classifies Blazek's lack of cooperation as passive resistance, *ante* at 6, a conclusion that finds support in our case law. *See Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006). However, any additional force that reasonably may be used to respond to passive resistance depends on the nature of that resistance as well as the circumstances confronting the officer. *See id.*; *cf. Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009) (finding that reasonable jury could conclude that arrestee's act of pushing officer "may have been *de minimis* or inconsequential"). For example, Blazek's refusal to identify himself and failure to remain seated are less consequential than the passive resistance present in *Wertish*, where the plaintiff, after leading officers on a low-speed chase for several miles, disobeyed officers' orders to exit his vehicle, position his hands for handcuffing, and stand up. *See Wertish*, 433 F.3d at 1065, 1067.

Turning to the use of force alleged here, Blazek claims that the officers handcuffed him immediately after he remarked "maybe I should be talking to a lawyer." He made this statement in response to Officer Santiago, who had repeatedly yelled accusations that Blazek had flushed drugs down the toilet. Blazek avers that the officers then did the following: "Officer Santiago grabbed my right arm, twisted it upward and behind my back and then threw me to the floor. Officer Roth then

-13-

jumped on me and handcuffed me while both officers were holding me down." Blazek also alleges that "[a]fter applying the handcuffs, Officers Santiago and Roth grabbed me by my arms and jerked me from the floor onto the mattress of my bed." Relying on Blazek's description of the handcuffing, the court reasons that Officers Santiago and Roth used essentially the same maneuver as the handcuffing technique that our court in *Wertish* and other circuits have found to be constitutional. *Ante* at 6 & 7-8 n.2. But the words used by Blazek to describe the force used to handcuff him are only part of the story. Unlike the plaintiff in *Wertish*, who only suffered *de minimis* injuries, 433 F.3d at 1067, an emergency-room doctor diagnosed Blazek with a separated shoulder and a fractured ankle. Moreover, Blazek later underwent surgery to repair a torn rotator cuff. Consistent with the rule that "[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used," *Chambers*, 641 F.3d at 906, the severity of Blazek's injuries is indicative of a significant degree of force.

It is unclear from the record whether grabbing and twisting Blazek's arm, throwing him to the floor, jumping on him, holding him down, jerking him from the floor, or some combination thereof caused Blazek's injuries. This uncertainty is magnified by the reality that these applications of force occurred as part of an unbroken sequence of events that unfolded over a very short period of time. As such, it is entirely possible that some or all of Blazek's injuries resulted from applications of force other than the officers' act of jerking Blazek from the floor. Indeed, it is difficult to surmise how jerking Blazek by his arms from the ground to his bed could have fractured his ankle. Considering the totality of the circumstances—including Officer Santiago's lack of suspicion that Blazek had committed a crime, the fact that Blazek was wearing a bath towel, the degree of Blazek's passive resistance, and the extent of his injuries—a reasonable jury could conclude that the officers' applications of force during the entire sequence of events—grabbing, twisting, throwing, jumping on, holding, and jerking—violated the Fourth Amendment.

-14-

This conclusion is wholly consistent with precedent. In *Copeland v. Locke*, 613 F.3d 875 (8th Cir. 2010), an opinion that postdates the incident here, we found that a reasonable jury could find a Fourth Amendment violation where an arrestee alleged that an officer "slammed [him] against a parked vehicle, threw him to the ground, handcuffed him, kneed him in the back, and clamped down on the handcuffs." *Id.* at 881. These applications of force left the arrestee with a chronic knee injury, abrasions across his body, and lacerations on his wrists. *Id.* The arrestee, like Blazek, engaged in some degree of passive resistance: when the officer attempted to handcuff the arrestee, he "backed away," requiring the officer to pursue him. *Id.* Similarly, in *Kukla v. Hulm*, 310 F.3d 1046 (8th Cir. 2002), we affirmed the denial of qualified immunity where an arrestee suffered injuries to his collar bone, shoulder, neck, and wrist. *Id.* at 1050. The arrestee in *Kukla* alleged that an officer "forced him against his truck, twisted his arm, and raised it high behind his back." *Id.* The arrestee also suffered a broken wrist from the tightness of the handcuffs, which the officer failed to loosen for fifteen minutes. *Id.* The arrestee did not actively resist the officer's attempt to handcuff him, but the arrestee refused to sign a ticket and "protested" when the officer announced that he was under arrest. *Id.* at 1048, 1050. In light of the similarities between Blazek's account of being handcuffed and those alleged in *Copeland* and *Kukla*, the first step of the qualified-immunity analysis involves nothing more than a straightforward application of precedent.

This brings me to the legal issue on which the court and I disagree: whether the constitutional right implicated by Blazek's handcuffing was clearly established at the time of the incident. This determination requires discerning whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A plaintiff need not show that "the very action in question has previously been held unlawful," *id.*, but he must establish that the unlawfulness was apparent in light of preexisting law, *id.* This circuit applies a "flexible standard" in conducting this inquiry, "requiring some, but not precise factual correspondence with

-15-

precedent, and demanding that officials apply general, well-developed legal principles." *Stoner*, 735 F.3d at 803 (quoting *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989)).

Judged by this standard, Officers Santiago and Roth violated a clearly established constitutional right. *Kukla*, a then-existing precedent in this circuit, and the analogous decisions of our sister circuits demonstrate as much. By distinguishing *Kukla* on its facts, *ante* at 7, the court mandates too much factual correspondence between past cases and the present scenario. *Kukla* is far more analogous to this case than the court allows. The arrestee in *Kukla* alleged that the officer "forced him against his truck, twisted his arm, and raised it high behind his back." 310 F.3d at 1050. Blazek describes his experience using similar language, alleging that Officer Santiago "grabbed" his right arm and "twisted" it upward and behind his back. Blazek's handcuffing also involved additional applications of force beyond those present in *Kukla*, including Officer Santiago "thr[owing ]" Blazek to the floor as well as Officer Roth "jump[ing]" on Blazek to apply the handcuffs while both officers held Blazek down. The arrestee in *Kukla* suffered injuries to his collar bone, shoulder, neck, and wrist, *id.*; Blazek, similarly, suffered a separated shoulder, a torn rotator cuff, and a fractured ankle.

The court distinguishes *Kukla* in two ways. First, the court finds significant that the arrestee in *Kukla* suffered a broken wrist due to the tightness of the handcuffs, whereas Blazek did not allege a similar injury. *Ante* at 7. The court, in effect, makes *Kukla* all about tight handcuffs. The *Kukla* court, however, did not limit its denial of qualified immunity in the manner implied by the court. *Kukla* denied qualified immunity for *all* of the officer's conduct in handcuffing the arrestee, including the officer's actions prior to tightening the handcuffs. 310 F.3d at 1050. The court's second basis for distinguishing *Kukla* is the perceived absence of resistance by the arrestee. *Ante* at 7. It is true that the *Kukla* court noted "the lack of active resistance to arrest" by the arrestee, 310 F.3d at 1050, but the arrestee *did*

-16-

refuse to sign a ticket and "protested" the officer's announcement that he was under arrest, *id.* at 1048—acts that would fit within the definition of passive resistance adopted by the court, *ante* at 6. Moreover, to the extent that this passive resistance differs from Blazek's refusal to provide his name and stay seated, such a difference favors Blazek because the arrestee in *Kukla* actually "protested" the officer's decision to handcuff him, 310 F.3d at 1048, whereas Blazek alleges that he did not protest being handcuffed. Accordingly, after *Kukla*, a reasonable officer would understand that the degree of force applied by Officers Santiago and Roth to handcuff Blazek is constitutionally excessive.

The court contends that such a rule turns on "fine distinctions" that are imperceptible to an officer who is acting in real time. *Ante* at 8-9. This assessment flows from the court's characterization of Blazek's handcuffing as "a relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Ante* at 6, 9 (quotation omitted). A handcuffing technique that causes a separated shoulder, a torn rotator cuff, and a fractured ankle cannot be labeled as "common." Applying this technique in a way that causes a *de minimis* injury is, for purposes of summary judgment, clearly distinct from applying it so as to cause the serious injuries alleged here.[4] *Compare Wertish*, 433 F.3d at 1066-67, *with Kukla*, 310 F.3d at 1050. This is not to say that a reasonable officer must contemplate the injury that his force may cause before handcuffing a suspect. Rather, the degree of injury that an arrestee

---

[4]The court downplays the degree of Blazek's injuries by reasoning that they may be the "unpredictable and fortuitous consequence[] of an officer's use of force." *Ante* at 6 (quotation omitted). The court also posits that "an awkward landing" or the unfortunate positioning of Blazek's foot may have caused his injuries. *Ante* at 8. The court's focus on these other potential causes of Blazek's injuries overlooks, at a procedural juncture in which Blazek receives the benefit of all reasonable inferences, the very real possibility that the officers' applications of force to handcuff Blazek, and not some other intervening factor, caused Blazek's injuries. *See Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010) (finding genuine dispute about whether injuries resulted because of peculiarities of plaintiff or from use of force).

sustains informs our assessment of how much force is at issue. *See Chambers*, 641 F.3d at 906 ("The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used.").

That the constitutional right at issue was clearly established is further supported by the then-existing views of our sister circuits. The First, Second, and Sixth Circuits have reached similar conclusions to that in *Kukla*, and the First Circuit even cited *Kukla* in doing so. *Morelli v. Webster*, 552 F.3d 12, 16, 21, 23-25 (1st Cir. 2009) (citing *Kukla* and denying qualified immunity where officer subdued and detained plaintiff by "grabbing her wrist, yanking her around, slamming her against the hallway wall, [and] pinning her there by her forearms [for several minutes]," which caused contusions, a separated shoulder, and a torn rotator cuff; noting that "plaintiff's attempt to walk past [the officer] might have given [him] the right to use a modicum of force to effectuate a stop"); *Robison v. Via*, 821 F.2d 913, 916, 923-24 (2d Cir. 1987) (concluding that reasonable jury could find that officer used excessive force to subdue and detain plaintiff where, after plaintiff disobeyed officer's order, officer "pushed" plaintiff against car door, "yanked" her out of the car, "threw" her up against the fender, and "twisted" her arm behind her back, which caused bruising that lasted several weeks);[5] *Minchella v. Bauman*, 72 F. App'x 405, 407-10 (6th Cir. 2003) (finding genuine dispute of fact where, after plaintiff refused to comply with officer's order and "began to turn away from the Officers," officers "twisted [plaintiff's] arms, slammed her into [a] police car, and [] one of the Officers kicked her in the ankle"; noting that plaintiff sprained her wrist).[6]

---

[5]Although *Robison* was decided under the Fourteenth Amendment, 821 F.2d at 924-25, its rule has been applied in the Fourth Amendment context, *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123-24 (2d Cir. 2004) (Sotomayor, J.).

[6]The court cites several cases from other circuits that it reads as supportive of its view. *Ante* at 6 & 7-8 n.2. Absent from every case cited by the court, save two, is a plaintiff who suffered any injury. The two exceptions, moreover, are readily distinguishable. *Rodriguez v. Farrell*, 280 F.3d 1341, 1352-53 (11th Cir. 2002)

Notwithstanding *Kukla* and other analogous decisions, the court artificially separates an unbroken sequence of events that involved multiple applications of force—grabbing, twisting, throwing, jumping on, holding, and jerking—to grant qualified immunity for all but one of these uses of force. The court takes this step even though we cannot determine which use (or uses) of force caused Blazek to suffer a separated shoulder, a torn rotator cuff, and a fractured ankle. The court justifies its unusual bifurcation of this incident by concluding that of the applications of force at issue here, a reasonable officer would have understood that only one of them—the jerking—violates the Constitution. Because precedent clearly establishes that a reasonable officer would not draw this distinction, I respectfully dissent.[7]

---

(finding that officer's use of force caused injury to plaintiff because of particularities of plaintiff of which officer was not aware); *Goodrich v. Everett*, 193 F. App'x 551, 553, 556-57 (6th Cir. 2006) (finding officer's use of force to be objectively reasonable where reasonable officer would have suspected plaintiff of recently committing violent assault and would have suspected that plaintiff, after refusing to stop his car for two miles even though he was being chased by multiple police cars, was attempting to flee).

[7]Bifurcating an incident in which there is no clear demarcation between the applications of force or resultant injuries may create practical difficulties at trial: Will the jury be allowed to consider evidence of the force used during Blazek's handcuffing? Will the jury be required to determine which application of force caused which injury? While these difficulties likely are not insurmountable, the court's decision to grant qualified immunity for a portion of an unbroken series of events no doubt will complicate the task of the district court and the jury.