In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1352

FALYN BRUCE,

*Plaintiff-Appellant,*

*v.*

DEREK GUERNSEY, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 12-3198 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 18, 2014 — DECIDED JANUARY 26, 2015

Before WOOD, *Chief Judge*, and POSNER and MANION, *Circuit Judges*.

WOOD, *Chief Judge*. After Falyn Bruce's high-school boyfriend told a school official that Bruce had attempted to kill herself, the official contacted local authorities. A police officer, Justin Harris, went to the home where Bruce was staying and detained her until a county sheriff's deputy, Derek Guernsey, arrived on the scene. Guernsey then took Bruce against her will to a local hospital where she was subjected

to a mental health examination. At the time they took these steps, Harris and Guernsey had only a report of Bruce's alleged suicidal ideation; they took no account of contradictory information, including her father's statements and her calm demeanor. Bruce filed this lawsuit under 42 U.S.C. § 1983, alleging that Harris and Guernsey's actions constituted an unreasonable seizure in violation of the Fourth Amendment, as applied to the states. The district court held that probable cause for the seizure was apparent on the face of Bruce's complaint. It also found that Guernsey had arguable probable cause and thus was entitled to qualified immunity. Bruce has appealed; we now affirm the district court's judgment in favor of Harris but reverse and remand for further proceedings as to Guernsey.

## I

Our account of the facts follows Bruce's First Amended Complaint. Because the district court dismissed for failure to state a claim, we proceed on the assumption that these facts are true (without making any finding to that effect). See *Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 620 (7th Cir. 2012). On September 5, 2011, Bruce was with her boyfriend, B.S., at B.S.'s home. At the time, Bruce was 17 years old. Bruce and B.S. had an argument, and Bruce wanted to leave. Initially B.S. attempted to stop her, but Bruce eventually managed to get away. She contacted her friend, D.F., and wound up spending the night at D.F.'s home. Around 8:00 the next morning, Bruce spoke on the phone with James Bruce, her father and custodial guardian. She explained to him that she was fine but did not want to go to school. Mr. Bruce told her that he would inform her school, Riverton High School, that she would be absent.

Sometime on the morning of September 6, B.S. told some of Bruce's friends that Bruce had attempted suicide the night before by tightening a belt around her neck. (Bruce swears that this is a lie and that she never has been suicidal.) But she was not around to refute the assertion, and so some of her friends told the Riverton High School guidance counselor about B.S.'s claim. The counselor contacted the Riverton Police Department. The Department dispatched police officer Andrew Landgrebe to the school. Mr. Bruce—who later arrived at the school—told Landgrebe that he had spoken to Bruce and that she was fine. Landgrebe, however, disregarded the father's statement, contacted the Sangamon County dispatch service, told the dispatcher that Bruce was possibly suicidal, and suggested that they send someone to check on her.

At 10:17 a.m., a dispatcher for Sangamon County contacted Rochester Police Department officer Justin Harris and told him that Bruce was possibly suicidal. Harris went to D.F.'s house and spoke to Bruce. During this encounter, Bruce was "perfectly fine and showed absolutely no signs of physical, mental or emotional distress." Harris evidently thought so: he advised the Sangamon County dispatch that Bruce was "o.k." and that emergency medical services were not needed. Nevertheless, Harris entered D.F.'s home and told Bruce to come outside of the house because "Sangamon County was coming to get her." In response to Bruce's question why she had to leave the house, Harris said, "if you want to ask questions I can just handcuff you and take you out myself." Feeling that she had no choice, Bruce went outside to the driveway. There were other people at D.F.'s home with Bruce, but Harris did not ask any of them whether they had any concerns about Bruce's mental state. He never asked

Bruce about her mental wellbeing, nor did he observe any physical injuries.

At 10:26 a.m., a Sangamon County dispatcher contacted Mr. Bruce and gave him the address of D.F's home. The dispatcher told him that Bruce was fine and that he should go to the home to pick her up. At 10:54 a.m., Sangamon County Sheriff's Deputy Derek Guernsey arrived at D.F.'s house; Mr. Bruce arrived at the same time. Two minutes later, Harris left the scene. That was the last Harris saw of Bruce; this means that Harris was present for less than 37 minutes (he was contacted at 10:17, presumably took a few minutes to travel to the house, and then left at 10:54).

When Guernsey arrived, he directed Bruce to get into his police car. Both Bruce and her father objected, telling Guernsey that Bruce was fine and that they wanted Bruce to go with Mr. Bruce. Guernsey insisted, however, that Bruce come with him to St. John's Hospital. At this time, Guernsey had been told only that Bruce was possibly suicidal; he had not been informed that she allegedly had threatened or attempted suicide. He did not ask Bruce or anyone else present about her mental state. In fact, throughout all these events neither Guernsey nor Harris personally observed any behavior or actions indicating that Bruce was mentally disturbed or a danger to herself or others.

At 11:05 a.m., Guernsey left D.F.'s home with Bruce in his police car; the two arrived at St. John's Hospital shortly thereafter. (It appears that Mr. Bruce drove there separately, became upset, and was eventually forced to leave.) At the hospital, Guernsey and another sheriff's deputy, Troy Sweeney, retained custody of Bruce until the hospital briefly admitted her at 1:55 p.m. Guernsey signed a "petition for in-

voluntary judicial admission" at 11:30 a.m. In the petition, he stated that Bruce was likely to harm herself or others if not treated as an inpatient and that Bruce needed immediate hospitalization. Guernsey's petition incorrectly noted that he was attaching a copy of a doctor's medical examination; in fact, none was attached. (There was an option to state that no certificate was attached because a doctor could not be located after a diligent effort, but Guernsey did not select this option.) He also falsely wrote in the petition that Bruce had told him that she was thinking of suicide. Bruce did not see a doctor until 11:53 a.m., after Guernsey completed the form. A few hours after she was admitted to St. John's, she was sent to a nearby behavioral health center for evaluation; she was released from that institution three days later.

Bruce later initiated this lawsuit under 42 U.S.C. § 1983. She sued Harris, Guernsey, and Sweeney, alleging that they violated the Fourth Amendment by unreasonably seizing her. In addition, Bruce alleged a due process violation by Guernsey related to his filing of a false document, *i.e.*, the petition for involuntary judicial admission. Bruce also named Sangamon County and the Rochester Police Department as defendants, alleging a failure to train their employees.

The defendants promptly filed motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court granted them, dismissing the complaint without prejudice. Bruce then filed an amended complaint containing essentially the same allegations except for the due process claim against Guernsey. Again the district court dismissed the complaint without prejudice. It found that Harris and Guernsey had probable cause to seize

Bruce and that Guernsey was entitled to qualified immunity in any case because he had at least arguable probable cause when he took Bruce into custody.

Because she had no additional facts to plead, Bruce moved to modify the district court's order to a dismissal with prejudice, so that she could appeal. The district court obliged with an order stating that it would dismiss the complaint with prejudice if Bruce filed a notice of appeal. After Bruce did so, the district court entered final judgment. Bruce then filed an amended notice of appeal to make clear that she was appealing the district court's final judgment. (This was a belt-and-suspenders move. See FED. R. APP. P. 4(a)(2). That is why we eventually dismissed the second appeal.) Bruce now challenges only the district court's dismissals of Harris and Guernsey.

## II

We review a district court's dismissal for failure to state a claim *de novo*. See *Santana*, 679 F.3d at 620. Because both defendants concede that they seized Bruce, the central question for this appeal is whether each defendant had either probable cause to do so, or arguable probable cause such that he is entitled to qualified immunity. (Neither defendant argues that *Terry v. Ohio*, 392 U.S. 1 (1968), justified his actions.)

The Fourth Amendment of the Constitution governs mental-health seizures. See *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013). Like ordinary seizures, mental-health seizures comply with the Fourth Amendment if officers have probable cause, which exists "only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Id.* (quoting *Villa-*

*nova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992)). Generally speaking, a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others. See, *e.g.*, *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997).

Bruce argues that a mental-health seizure of a minor in Illinois is constitutional only if the officer personally has observed something that gives him reasonable grounds to believe that the minor is eligible for admission to a mental health facility and needs immediate hospitalization to protect herself or others. She points to the Illinois Mental Health and Developmental Disabilities Code, which included that rule at the time of the events here. See 405 Ill. Comp. Stat. Ann. § 5/3-504(b), *amended by* 2014 Ill. Legis. Serv. 98-975 (West) (modifying this provision to exclude the personal observation requirement). Because Harris and Guernsey did not personally observe any behavior indicating mental disturbances, Bruce claims that the seizure was unconstitutional.

As we have noted repeatedly, however, the constitutionality of a seizure does not depend on the particularities of state law. We noted in *Chathas v. Smith*, 884 F.2d 980 (7th Cir. 1989), that for federal constitutional purposes "[a] police officer need not personally witness the behavior giving rise to the probable cause—even if there must be personal observation according to a state statute." *Id.* at 987. And in *McKinney v. George*, 726 F.2d 1183 (7th Cir. 1984), we upheld a similar seizure that did not meet the Illinois requirement of personal observation, remarking that the Fourth Amendment reasonableness standard is federal. *Id.* at 1188–89 (noting that if an officer has probable cause for an arrest, "it is immaterial to

the constitutionality of their conduct that the arrest may have violated state law"). The present case fits that pattern, and we come to the same conclusion: the constitutionality of a mental-health seizure does not depend on whether the officer met each requirement spelled out by Illinois state law. Whether or not an officer complied with these state law conditions may have some evidentiary value when determining whether that officer's conduct was reasonable, but a violation of the Illinois Mental Health and Developmental Disabilities Code does not constitute a *per se* violation of the Fourth Amendment. Our task instead is to see whether Harris and Guernsey had probable cause to believe that Bruce needed immediate hospitalization because she was a danger to herself or others. In making that determination, we bear in mind the collective knowledge doctrine, under which a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works. See *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010); see generally *United States v. Hensley*, 469 U.S. 221 (1985) (one police department could rely on another's "wanted" flyer to support a stop).

*Justin Harris*

Harris was summoned to D.F.'s home by the Sangamon County dispatch service at 10:17 a.m.; he arrived a few minutes later. After knocking on the door and speaking with Bruce, he ordered Bruce to come out of the house and remain with him in the driveway. Bruce was in Harris's custody until 10:54 a.m., when Guernsey arrived and took control of the scene. Harris left the scene two minutes later. The dispatcher had told Harris that Bruce was possibly suicidal, but

Harris had no other information regarding Bruce's mental state.

Even giving Bruce the benefit of the doubt, we agree with the district court that she has not described a situation in which Harris violated her constitutional rights. Knowing that Bruce was possibly suicidal, Harris merely ordered her out of the home in which she was staying and kept her within his custody for a relatively short time (less than 37 minutes). He did not remove Bruce from the general vicinity in which he found her; he kept an eye on her until Guernsey arrived. Harris was the first officer to arrive on the scene, but the little information he had been given about the possible fragility of Bruce's mental state supported his decision to maintain custody over Bruce for this brief time. Even if he acted in an overly brusque manner, as Bruce alleges, his seizure of her did not violate the Fourth Amendment.

*Derek Guernsey*

Guernsey's participation in these events was more prolonged and involved. After arriving at D.F.'s home and taking over from Harris, he ordered Bruce into his police car over the protests of both Bruce and her father. At that point he whisked Bruce off to the hospital against both her will and that of her father (and recall, she was still a minor at this time). Once at the hospital, Guernsey signed a petition for involuntary judicial admission that included several material falsehoods. In particular, Guernsey said that he was attaching a copy of a physician's medical examination, but no doctor had examined Bruce, and Guernsey wrote that Bruce told *him* that she was thinking of suicide, but Bruce denies saying such a thing (and for present purposes we must credit her account).

Even if the initial act of taking control over Bruce at D.F.'s home was permissible, and that is not clear given the simultaneous appearance of Mr. Bruce, we cannot say on this limited record that Guernsey's transportation of Bruce to the hospital and his actions while there were objectively reasonable. By that time, much more information was available than the initial imprecise and potentially unreliable tip from the ex-boyfriend. See *Bailey v. Kennedy*, 349 F.3d 731, 739–41 (4th Cir. 2003) (finding that officers did not have probable cause to seize the plaintiff and take him to the hospital where their visit to the plaintiff's home was prompted by a 911 call from a neighbor and when upon arrival the plaintiff was alone eating lunch and was not visibly distraught). Guernsey's actions went well beyond a temporary seizure by an officer facing an unknown situation. On Bruce's version of the facts, Guernsey forced a perfectly calm and rational minor, surrounded by several friends and her father, to get in his police car so that she could be taken to the hospital, over the objections of the father, based solely on a report that she was possibly suicidal.

Once at the hospital, Guernsey's lies helped ensure that Bruce remained in custody against her will for an even longer period. Bruce suggests that Guernsey's checking of the box indicating that he had attached a copy of a medical examination is a lie because it implies that Bruce already had been examined by a physician when she had not. Maybe it was a mistake, but we cannot make an assumption favorable to Guernsey at this stage of the case. It is fair to infer that the misrepresentation made the hospital more likely to admit her, as it gave credence to the idea that Bruce needed medical attention. Of even more concern is the alleged statement

that Bruce told Guernsey that she was thinking of suicide, which certainly increased the probability that Bruce would be kept against her will in an institution for observation. *Cf. Franks v. Delaware*, 438 U.S. 154, 171–72 (1978) (false statement made in a sworn statement used to procure a search warrant could be violation of Fourth Amendment if statement was necessary to finding of probable cause).

Guernsey argues that the seizure was constitutional because, in addition to the information that Bruce was possibly suicidal, he knew that Bruce had not attended school that day and was staying with a male friend 15 miles away from her home. The latter two facts, however, shed little if any light on Bruce's mental state. Teenagers have been known to skip school on more than a few occasions and without a hint of mental instability. It is common for a parent to call the school and alert it to a sick day or a late arrival, and that is just what Mr. Bruce did. The fact that Bruce was staying with a male friend on a school night—and that her father had not known exactly where she was—might have indicated to Guernsey that something was amiss, but he had no way of knowing whether this behavior was caused by a mental disturbance or ordinary teenage rebellion and free-spiritedness. Factual development may reveal that the latter is the case, considering the fact that Bruce was found accompanied by several other people at D.F.'s home, and that she had no hesitation in calling her father that morning before any of these events erupted. Finally, as Bruce emphasizes, she was calm at all times and exhibited no signs of being suicidal.

Guernsey also argues that the fact that Bruce was ultimately admitted to the hospital and later involuntarily

committed to a behavioral health center for three days demonstrates that he had probable cause to seize her. But the Fourth Amendment requires an *ex ante*, not an *ex post*, analysis. See *Saucier v. Katz*, 533 U.S. 194, 207 (2001) (explaining that most issues under the Fourth Amendment "are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred"); *Scott v. United States*, 436 U.S. 128, 137 (1978) ("[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him."); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (probable cause must be based on facts and circumstances within officers' knowledge and "of which they had reasonably trustworthy information"). In fact, this *ex ante* approach is beneficial to police officers because it allows them to act quickly based on the information at their fingertips, without worrying that evidence discovered at a later time will ultimately demonstrate that they acted unreasonably. Here, when Guernsey seized Bruce, he did not know that she would ultimately be admitted for care; he knew only that she was possibly suicidal. And, as we discussed above, this knowledge was insufficient to provide probable cause for Guernsey's prolonged seizure. (We note, however, that the hospital's decision to commit her may shed some light on what Guernsey was observing during his encounter with her. This too needs further factual development.)

Finally, Guernsey asserts that even if his actions violated the Fourth Amendment, he is entitled to qualified immunity. Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or constitu-

tional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When the constitutionality of an action depends on the existence of probable cause, the officer must have had "arguable probable cause" for qualified immunity to attach. *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). Thus, even when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer "could have reasonably believed that probable cause existed in light of well-established law." *Id.* (citing *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)).

While arguable probable cause is a relatively flexible standard, it does not bend so far as to encompass Guernsey's actions at this early stage in the case. Recall that for mental-health seizures, the question is whether there is probable cause to believe that the subject of the seizure is a danger to herself or others. This record does not establish as a matter of law that Guernsey, whose *only* indication that Bruce might commit suicide was the knowledge that someone had said Bruce was potentially suicidal, reasonably believed that he had probable cause to continue to seize her. When determining whether arguable probable cause exists, we must take into consideration the particular circumstances facing the officer. Guernsey faced a calm and undisturbed high school student who was at a friend's house with several other companions and whose father was present and objecting to Guernsey's actions. Not only did Guernsey take Bruce from D.F.'s home to the hospital against both her will and that of her father, but he also made misrepresentations on the petition for involuntary judicial admission and thus made it more likely that Bruce's confinement would contin-

ue. On this view of the facts, Guernsey is not entitled to qualified immunity.

We stress, however, that this is an early stage of the case. It is possible that after further discovery, Guernsey may decide to move again for qualified immunity or for summary judgment. See *Jacobs v. City of Chi.*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). We note as well that Bruce is pursuing an action in state court in Sangamon County against St. John's Hospital and its personnel. See *Bruce v. St. John's Hosp., et al.*, No. 2013-L-000055 (Ill. Cir. Ct.) That case may shed further light on Bruce's mental state on the day of the events, her father's behavior and statements while at the hospital, and, ultimately, the reasonableness of Guernsey's actions. While medical evidence related to Bruce's admission to the hospital cannot by itself exonerate Guernsey, given the *ex ante* perspective that applies, such evidence may still be relevant. For example, if Guernsey argues that Bruce was not perfectly calm and rational but rather was exhibiting signs of mental instability, medical records could corroborate (or refute) his account of the facts. In the interest of both efficiency and comity, the district court should consider staying this case until the pending state litigation is complete.

## III

While Harris had indisputable probable cause to detain Bruce briefly, Bruce's case against Guernsey cannot be resolved so readily. Taking the facts favorably to Bruce, Guernsey overstepped the boundaries of the Fourth Amendment in taking her to the hospital and making false statements that resulted in a more prolonged seizure. We therefore AFFIRM the judgment of the district court as to Count I of the complaint but REVERSE as to Count II. We

REMAND the case for further proceedings as to Count II but invite the court to consider staying the case until Bruce's state court proceedings have terminated.