RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DONALD MACHAN, an individual and as next friend of
his daughter, T.R.,

*Plaintiff-Appellee*,

  *v.*

SHAWN OLNEY, individually,

*Defendant-Appellant*.

No. 18-1691

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00450—Robert J. Jonker, District Judge.

Argued: October 24, 2019

Decided and Filed: May 14, 2020

Before: KETHLEDGE, BUSH, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Marcelyn A. Stepanski, ROSATI, SCHULTZ, JOPPICH & AMTSBUECHLER,
PC, Farmington Hills, Michigan, for Appellant. William F. Piper, WILLIAM F. PIPER PLC,
Portage, Michigan, for Appellee. **ON BRIEF:** Marcelyn A. Stepanski, ROSATI, SCHULTZ,
JOPPICH & AMTSBUECHLER, PC, Farmington Hills, Michigan, for Appellant. William F.
Piper, WILLIAM F. PIPER PLC, Portage, Michigan, for Appellee.

─────────────

## OPINION

─────────────

KETHLEDGE, Circuit Judge. Shawn Olney, a police officer assigned to a middle
school, heard from the school's principal that a student, T.R., had told the principal that she had

been contemplating suicide for about a month.  Based on that report, Olney took T.R. to a nearby hospital for a mental evaluation.  T.R.'s father, Donald Machan, claims that Olney violated his and T.R.'s constitutional rights in doing so.  On appeal, Machan now concedes what he disputed in the district court:  that T.R. had indeed told her principal that she had been contemplating suicide—as a video from the hospital visit makes clear.  We hold that Olney was entitled to summary judgment on Machan's claims, and reverse the district court's decision to the contrary.

I.

We take the district court's view of the facts in the light most favorable to Machan, except that we reject his allegations to the extent they are clearly contradicted by "'a videotape capturing the events in question.'" *Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

In October 2016, T.R., then in the seventh grade, sought out a school counselor with whom she had met in the past.  The counselor was not available, so T.R. instead met with the school principal, Latonya Gill-Williams.  Machan concedes on appeal that T.R. told Gill-Williams that she had been thinking about suicide for the past month, and that "she sees things at home like guns and knives that makes [sic] her want to hurt herself."  R. 96-8 at Page ID 786, 789, 794.  Gill-Williams called a police officer assigned to the school, Shawn Olney, who arrived at Gill-Williams's office a few minutes later.  Gill-Williams then told Olney what T.R. had told her.  Olney called Machan, who was at work about 90 minutes away, and told him that T.R. "was being suicidal" and that Olney planned to take her to the hospital for an evaluation.  Machan objected and told Olney to keep T.R. at the school until he got there.

Olney took T.R. to the hospital anyway.  A video from a police officer's body camera depicts much of what happened there.  Jennifer Parker, an emergency-room nurse, conducted a mental-health assessment of T.R. and concluded that T.R. needed treatment.  Although T.R. did not appear intoxicated or disoriented, the attending physician, Dr. Gerald Friedman, ordered a blood draw as part of the hospital's standard procedure for a mental evaluation.  T.R. resisted the blood draw, which tested negative for drugs.  Dr. Friedman and other medical staff then talked to T.R. about her suicidal thoughts.  Eventually Machan arrived and renewed his objections to

T.R.'s presence at the hospital. After considerable discussion with Machan, the hospital's medical staff released T.R. on condition that Machan take her to a nearby mental-health center. Machan then took T.R. there, where they stayed for about 45 minutes before going home.

Machan thereafter brought this lawsuit, claiming among other things that Olney violated T.R.'s constitutional rights and his own, as her father, when Olney took T.R. to the hospital over his objection and by authorizing the blood draw without his consent. Olney moved for summary judgment, which the district court denied on the ground that Olney was not entitled to qualified immunity for her actions. Olney then brought this appeal.

II.

We review de novo the district court's denial of qualified immunity. *Hayden*, 640 F.3d at 153. Determinations of qualified immunity require us to answer two questions: first, whether the officer violated a constitutional right; and second, whether that right was clearly established in light of the specific context of the case. *Id.* We can answer those questions in whichever order we see fit. *Id.*

Machan's first claim is that Olney violated the Fourth Amendment both when she took T.R. to the hospital for a mental evaluation over his objection and when she authorized the blood draw. "The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). "A showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Ziegler v. Aukerman*, 512 F.3d 777, 783 (6th Cir. 2008) (internal quotation marks omitted).

Here, Olney heard that T.R. herself came to Gill-Williams to say that she had been thinking about suicide, that T.R. had been having suicidal thoughts for about a month, and that she worried about hurting herself with the guns and kitchen knives in her home. Those facts provided Olney with ample grounds to think that T.R. posed a danger to herself, and thus provided probable cause for Olney to take T.R. into protective custody for a mental evaluation. And where the person is suicidal, the mental evaluation can reasonably include a determination

whether the person has already acted upon her suicidal thoughts; which means the officer can authorize a blood draw as part of that evaluation.

Machan argues that Olney lacked probable cause to think that T.R. was a danger to herself, because T.R. had not expressed any present intention to act upon her suicidal thoughts. But T.R. herself was distressed enough about those thoughts to seek help from school officials, which supported Olney's conclusion that there was a substantial chance that T.R. might act on those thoughts. And that T.R. herself reported her suicidal thoughts makes her case easily distinguishable from cases where the plaintiff denied having such thoughts and showed no signs of having them. For example, in *Fisher v. Harden*, 398 F.3d 837 (6th Cir. 2005), officers responded to a report that a man had tied himself to some railroad tracks; but the plaintiff "presented the appearance of an elderly man hunting in a location where hunters are commonly found[,]" and "[e]verything about Fisher's appearance, in that setting, suggested a benign encounter rather than a dangerous one." *Id.* at 845. And in *Bruce v. Guernsey*, 777 F.3d 872 (7th Cir. 2015), the plaintiff, a 17 year-old high-school student, presented as "perfectly fine and showed absolutely no signs of physical, mental or emotional distress." *Id.* at 874. This case is instead more like *Monday*, where the plaintiff himself had called a mental-health hotline, and officers upon arriving at the scene had reason to think he was suicidal. *Monday,* 118 F.3d at 1101. Both the record and the caselaw thus support Olney's actions here.

Machan also argues that, rather than take T.R. to the hospital for a mental evaluation without his consent, Olney should have simply detained T.R. at the school for 90 minutes, until Machan could arrive to take her home. But Olney had reason to fear that T.R. might hurt herself at home, given that T.R. herself had just said that "she sees things" there (*i.e.*, guns and knives) that made "her want to hurt herself." R. 96-8 at PageID 794. Moreover, seizures by definition are not consensual; and the existence of probable cause meant that Olney did not need Machan's consent to take T.R. to the hospital for a mental evaluation. Olney therefore did not violate the Fourth Amendment when she took T.R. to the hospital and authorized the blood draw.

Yet that very same conduct, Machan claims, amounted to a violation of both his and T.R.'s substantive due process rights. To overcome qualified immunity, however, Machan must identify a case whose facts and holding would make "clear to a reasonable officer that his

conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). And Machan has not remotely identified any such case here. Olney is therefore entitled to qualified immunity on Machan's substantive due process claims.

\* \* \*

The district court's June 1, 2018 order is reversed, and the case is remanded with instructions to enter judgment in favor of Olney.