NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0519n.06
No. 19-2366

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KURT HAMMOND, | ) | **FILED** |
| | ) | Sep 04, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF OAKLAND, MICHIGAN, a | ) | ON APPEAL FROM THE |
| Municipal Corporation; CHRISTOPHER | ) | UNITED STATES DISTRICT |
| CADOTTE, JAMES SALYERS, and DAVID | ) | COURT FOR THE EASTERN |
| WELCH, Deputies, in their individual capacities, | ) | DISTRICT OF MICHIGAN |
| jointly and severally, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: ROGERS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

KETHLEDGE, Circuit Judge. The facts of this case, as we are required to view them, are that three Oakland County sheriff's deputies pinned Kurt Hammond to the ground, handcuffed him, and then ordered a police dog to bite him. The district court held that the deputies' actions violated Hammond's clearly established constitutional rights, thereby precluding qualified immunity. We affirm in part and reverse in part.

We take the district court's view of the facts in the light most favorable to Hammond. *See Machan v. Olney*, 958 F.3d 1212, 1213 (6th Cir. 2020). On December 3, 2016, a woman stabbed Kurt Hammond in the chest, fled from his house, and called the police to report that Hammond had raped her. Several deputies—including Christopher Cadotte and his dog, Odin—went to Hammond's house to investigate. Hammond was tending to his stab wound when he heard

banging on the back door. He thought the woman's friends had come to harm him, so he threatened to call the police. The deputies responded, "We are the police!" Hammond told the deputies to go to the front door, which he unlocked. Then Hammond "ran back into the bedroom" to continue tending to his stab wound. The bedroom was out of the deputies' sight, however, so they warned Hammond to come back out or they would release Odin into the house.

Hammond says he never heard that warning. Instead, while he was treating his stab wound, he looked up and saw Odin inside, barking to indicate Hammond's location to the deputies. Cadotte and deputies James Salyers and David Welch then entered the house as Hammond came out of the bedroom, within arm's length of the deputies. Cadotte tackled Hammond to the ground, where Salyers and Welch pinned him down to restrain him with handcuffs. Hammond refused to show his hands, however, because he was clutching bandages to his chest wound. The deputies eventually rolled Hammond onto his stomach and handcuffed him. At that point, Hammond says that he "heard some kind of foreign language," and then Odin started "ripping [him] in the back." Seconds later, Hammond says that he heard "another foreign language," and that Odin "changed positions on [his] back" and bit him again, this time on the right foot. Hammond cried out in pain and told the deputies that Odin was biting him, but, according to Hammond, the deputies replied that Odin "ain't doing nothing but holding you." Odin then shifted from Hammond's feet to his legs, "chewing and chewing" while, according to Hammond, the deputies "stood by and let the dog do what it wanted to do[.]" Hammond says that he then heard a deputy tell Odin to "stop or something," but the dog would not listen, even biting Cadotte in the process before finally being brought to heel. The entire takedown lasted approximately 20 seconds. Afterward Hammond was taken to a nearby hospital and treated for his injuries, including several broken bones in his foot.

Hammond thereafter brought this claim under 42 U.S.C. § 1983, alleging that the deputies used excessive force in violation of the Fourth Amendment. Hammond also sued Oakland County, claiming that the County failed to have an effective dog policy and failed to train Odin. The defendants moved for summary judgment, the deputies specifically on the basis of qualified immunity. The district court denied the motion. This appeal followed.

We review de novo the legal aspects of the district court's denial of qualified immunity. *Machan*, 958 F.3d at 1214. Determinations of qualified immunity require us to answer two questions: first, whether the officers violated a constitutional right; and second, whether that right was clearly established in light of the specific context of the case. *Id.* We may address those questions in whichever order we see fit. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But our jurisdiction is limited to the question whether the evidence, as considered by the district court in the light most favorable to Hammond, shows a violation of his clearly established constitutional rights. *See Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011).

Hammond first claims that the deputies violated "the Fourth Amendment's prohibition on the use of excessive force by arresting and investigating officers." *See Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011). We analyze that claim based on "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In doing so, we consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (internal quotation marks omitted). When, "as here, a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider

the officer's entitlement to qualified immunity at each step along the way." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

Here, the first segment came before the dog bites. The deputies had come to Hammond's house—an area unknown to them but familiar to Hammond—to investigate an allegation of rape. *See Matthews v. Jones*, 35 F.3d 1046, 1051 (6th Cir. 1994). They had no idea whether Hammond was armed, and his unusual behavior—namely, unlocking the door and immediately retreating out of sight—only heightened their suspicions. *See Matthews*, 35 F.3d at 1051. They warned Hammond that they would deploy Odin if he did not surrender himself, and though Hammond says he did not hear the warning, the officers could not have known that on the scene. *See id.* When the deputies finally encountered Hammond, he reappeared suddenly, within arm's length of the deputies, his hands not visible. Moreover, though the deputies ordered Hammond to show his hands, Hammond admits that he refused. Thus, a reasonable officer could view Hammond's actions as threatening. The deputies therefore did not use excessive force when they deployed Odin into the house to locate Hammond, tackled him to the ground, and pinned him there while handcuffing him.

The next segment came when Cadotte ordered Odin to bite Hammond after the deputies had handcuffed him. We have held that police violate the Fourth Amendment when they order a dog to bite a suspect who posed no threat to the officers' safety and was not resisting arrest or attempting to flee. *See Campbell v. City of Springboro*, 700 F.3d 779, 787–89 (6th Cir. 2012). Here, after the deputies handcuffed Hammond, he was on his stomach, handcuffed, with his hands visible. Although he had refused to surrender his hands earlier, at that point the deputies could see that Hammond was unarmed. And Hammond says he did nothing after the deputies handcuffed him that could be interpreted as resistance. Yet after Cadotte gave Odin commands in a foreign

language, the dog bit Hammond, first on his back and then on his leg and foot. Hammond could "hear [his] bones crackling in [his] head," and despite his pleas for help Cadotte did nothing to stop the dog from doing "what it wanted to do[.]" A jury could therefore find that Cadotte used excessive force when he ordered Odin to bite a handcuffed suspect who was not resisting arrest. *See id.*

Cadotte argues that Odin's bites came as a result of a "spontaneous response" to Hammond's "'threatening' movement into the dog's defensive perimeter." *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004). Dog bites violate the Fourth Amendment only if they come "through means intentionally applied." *Id.*; *see also Ashford v. Raby*, 951 F.3d 798, 802–03 (6th Cir. 2020). Cadotte says that Odin bit Hammond's legs and feet only after Hammond "began flailing . . . and kicked toward Odin's face," but Hammond tells a different story. He insists that these bites—and Cadotte's commands to instigate them—came after the deputies had handcuffed him and had pinned his legs down. Whether Hammond kicked toward Odin, as Cadotte claims, is thus a question of fact that we lack jurisdiction to consider. *See Walker*, 649 F.3d at 503.

Cadotte also argues that the law about the use of dogs was not clearly established at the time of this incident. But we have found a Fourth Amendment violation when "an inadequately trained canine" bit a handcuffed suspect. *Campbell*, 700 F.3d at 789. Here, as there, Cadotte ordered Odin to bite a suspect "who [was] not actively fleeing and who, because of proximity, showed no ability to evade police custody." *Id.* Any reasonable officer would have understood that commanding a dog to bite a handcuffed suspect who was not attempting to flee would violate the Fourth Amendment. Cadotte thus is not entitled to qualified immunity with respect to the bites.

Hammond also claims that Deputies Salyers and Welch violated the Fourth Amendment when they failed to stop the bites. Whether they did depends upon whether they "had both the

opportunity and the means to prevent the harm from occurring." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). But Hammond cites no caselaw clearly establishing that officers who are not trained as dog handlers have a duty to intervene and control a dog notwithstanding the presence of the dog's handler. Salyers and Welch are therefore entitled to qualified immunity from Hammond's claim.

Finally, Oakland County appeals the district court's denial of its motion for summary judgment. Unlike a denial of qualified immunity, an order denying a county's motion for summary judgment "is not an independently appealable final decision." *Hopper v. Plummer*, 887 F.3d 744, 760 (6th Cir. 2018). And here the resolution of the deputies' qualified-immunity appeal does not resolve the County's appeal. In that circumstance, the parties agree, we lack jurisdiction to hear the County's appeal. *Id.*

We affirm the denial of qualified immunity as to Deputy Cadotte's commands to Odin to bite Hammond, reverse the denial as to the rest of Hammond's claims, dismiss Oakland County's appeal for lack of jurisdiction, and remand the case for proceedings consistent with this opinion.