Robert ZUCKER, Plaintiff–Appellant,

v.

CITY OF FARMINGTON HILLS, et al., Defendants–Appellees.

No. 15–1202.

United States Court of Appeals, Sixth Circuit.

March 14, 2016.

BEFORE: BOGGS and DONALD, Circuit Judges; and HOOD, District Judge.*

BOGGS, Circuit Judge.

In 2009, officers of the Farmington Hills Police Department ("FHPD") approached Robert Zucker at his residence in an attempt to convince Zucker to accompany them to a nearby hospital for mental-health treatment. A physical confrontation ensued and officers forcibly detained

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Zucker, shocking him with a taser in the process. Zucker subsequently brought an action under 42 U.S.C. § 1983 in Michigan state court against the City of Farmington Hills and five members of the FHPD, alleging that FHPD officers had violated his constitutional rights by seizing and searching his person without probable cause and by using excessive force in doing so. The defendants removed the case to federal court and filed a motion for summary judgment, which the district court granted. For the reasons set forth below, we affirm the judgment of the district court.

## I. Factual Background & Procedural History

### A

On August 4, 2009, Zucker reported a home invasion to the FHPD. Officer Robert Tiderington responded to the call. Although he did not find signs of a forced entry into Zucker's apartment, Tiderington observed that the apartment was in "disarray." Tiderington's conversation with Zucker led Tiderington to believe that Zucker might suffer from a mental illness. After leaving Zucker's apartment, Tiderington went to the complex's management office to speak with the apartment-complex staff, whom Tiderington asked to locate Zucker's family "to see if they could check on [Zucker]." An employee of the apartment complex contacted Zucker's brother, who in turn contacted Zucker's daughter. Ms. Zucker then telephoned her father, who she knew suffered from bipolar disorder. Ms. Zucker grew increasingly concerned after she spoke with Zucker, who told her "about microorganisms self-cleaning and composting in ... the bathroom," and decided to travel to Michigan to check on his health.

Just over a week later, occupants of apartments near Zucker's began to complain about a water leak and an unpleasant odor that was emanating from Zucker's apartment. Upon investigating, David Cole, an employee of the apartment complex, found that Zucker's apartment was "in total disarray and filthy beyond what I've seen in a lot of units." The sinks held food and garbage, there was little room to walk, and the toilet contained boxes, plastics, and other materials.

After maintenance staff fixed the leak and left, Ms. Zucker—who had arrived from out of state to check on her father—entered the apartment. Zucker's daughter observed that a toilet in the apartment was inoperable and "jammed with trash" and that the apartment was in disarray. Zucker, who alleges that maintenance staff pushed him against a wall, was upset about Cole's entry into his apartment, told his daughter that he had a "right to defend his family and his property," and showed her a handgun that he had acquired. As Zucker later recounted, "I'd had a long history with the apartment complex of them doing things prejudicial to my well-being" and "told her that in case anything happened that there's a gun for our protection."

Upon seeing the weapon, Zucker's daughter promptly left the apartment and warned Cole, who was returning to help clean the apartment, not to go inside because Zucker had a gun. Cole and Ms. Zucker walked to the apartment clubhouse and called the FHPD dispatcher. Cole recounted to the dispatcher that Ms. Zucker had gone to her father's apartment to inform him that maintenance would have to enter the apartment again, after which she reemerged from the apartment and "told [Cole that Zucker's] gun is out." Cole also told the dispatcher that Zucker "[is] totally unstable."

Cole then handed the phone to Ms. Zucker, who identified herself and told the dispatcher that "I can't have [Zucker]

know that I was on the phone with you guys ... [b]ecause my life is on the line." She informed the dispatcher that Zucker was "in a manic state" with "delusional symptomology." Ms. Zucker went on to say that "something triggered something [in Zucker] about six weeks ago. Now, years ago he used to say he had [a] gun. I've never seen in my life a gun ... up until this moment, so I'm kinda scared right now." When the dispatcher asked whether Ms. Zucker could safely retrieve the gun from her father's apartment, she replied that she was "afraid to go back in the apartment" and that she "went running out the door." Although Ms. Zucker stated that her father had not threatened her with the gun, she cautioned that "he decides I'm the enemy, and I'm sending people to-he already threatened me before I came to ... Michigan." Ms. Zucker asked what the police planned to do and stated that "I don't want anyone else getting injured. I don't want the cops getting injured." After Ms. Zucker opined that she could not "in good conscience put anyone else in harm," the dispatcher assured her that law enforcement would come to speak with her first before taking any action.

FHPD Officers Tiderington and Allen and FHPD Sergeant Michaluk arrived at the clubhouse and spoke with Ms. Zucker and Cole. After the conversation, Michaluk reported over the radio that Ms. Zucker was "just absolutely terrified of [her father]." The officers had learned from Ms. Zucker and Cole that Zucker was "living in filth" and that Ms. Zucker saw her father "carrying a gun within his apartment," though he had not threatened her with it. Michaluk stated that he was "confident [that] we have enough to do a commitment on our own," noting that Zucker could not care for himself, was "using a toilet as the trash bin that is so overflowin[g] it will not flush, ... the whole apartment's in filth[,

and] [h]e's got water standing in the kitchen floor, which is leaking into other apartments." Michaluk later radioed to another officer that Zucker "clearly has a gun" and that Ms. Zucker was "scared to death of [her father], but will not articulate why." After a fourth FHPD officer, Officer Tomasovich–Morton, arrived on the scene, the agents decided that Officer Tiderington, whom officers thought Zucker would remember from the August 4 encounter, would call Zucker on the phone in an attempt to persuade him to leave the apartment.

The precise details of what happened next are disputed by the parties. According to the defendants, Officer Tiderington told Zucker that Tiderington would come to Zucker's apartment and subsequently approached the second-floor apartment with Officer Allen. Tiderington met Zucker in the hallway in front of the apartment, explained that Zucker's daughter was concerned for Zucker, and asked Zucker to come with the officers to the hospital. Zucker then said something, began to move his hands toward his jacket pockets, and turned to reenter the apartment. Fearful that Zucker was trying to reach for the gun, Tiderington grabbed Zucker's arm to prevent him from leaving, and both men fell to the floor. While Zucker and Tiderington struggled on the floor, Officer Allen saw Zucker reach into his jacket for what looked to be a shoulder holster. Allen warned Zucker that if he did not remove his hand from the jacket, Allen would shock him with a taser. When Zucker did not comply, Allen shocked him once.

Zucker's own deposition testimony offers a different story. According to Zucker, Officer Tiderington called and arranged to meet him in fifteen minutes outside of the apartment. Zucker stepped out of his apartment to find that Tiderington was

"bounding up the stairs." Without saying anything, Tiderington approached Zucker, locked arms with him, pulled him to the ground, and handcuffed him. Zucker was left "handcuffed lying with [his] back on the ground," hands behind his back, "[c]ompletely passive' and in shock." Tiderington then left Zucker bound and supine on the ground and entered the apartment, after which Officer Tomasovich–Morton arrived on the scene, wiped Zucker's mouth, stood up, and did a "knee drop on [his] chest." Subsequently, another officer, presumably Officer Allen, shocked Zucker continuously with a taser for approximately two minutes.

It is undisputed that after officers subdued Zucker, they searched his person and transported him to the hospital, where he was declared mentally unsound and in need of medical attention based in part on a petition for hospitalization signed by Officer Tiderington.

### B

In 2011, Zucker brought an action against the City of Farmington Hills and its Chief of Police, Charles Nebus, among other defendants, in Michigan state court. The defendants removed the case to federal court after Zucker added federal claims. As amended, his complaint asserted four state-law claims and four federal claims against the City of Farmington Hills, Officers Allen, Tomasovich–Morton, and Tiderington, Sergeant Michaluk, and Chief Nebus.

Zucker brought his federal claims under 42 U.S.C. § 1983, alleging four counts: First, in what is labeled as "Count IV," Zucker alleged that the individual defendants deprived him of "liberty or property without due process of law" and "[t]he right to be free from excessive force, and to be secure in his person" in violation of the Fourth and Fourteenth Amendments.

Second, Zucker alleged that the City of Farmington Hills has adopted a pattern or practice of allowing unconstitutional actions and failed to supervise or train the individual officers responsible for Zucker's constitutional injuries. Third, Zucker alleged that Chief Nebus and Sergeant Michaluk "acquiesc[ed] in unconstitutional conduct." Fourth, Zucker alleged that all individual defendants engaged in a conspiracy to deprive Zucker of his civil rights.

After the parties took discovery, the defendants moved for summary judgment on all of Zucker's claims, arguing in relevant part that Zucker could not prove that the officers had violated the Fourth Amendment because the seizure was supported by probable cause and because no excessive force was used. The individual defendants invoked qualified immunity and argued that Officer Tiderington's August 4, 2009, interaction with Zucker, Ms. Zucker's alarmed conversation with the FHPD dispatcher on August 13, 2009, and officers' conversations with Ms. Zucker and the apartment-complex staff all led officers to reasonably believe in a "probability or substantial chance" that Zucker was "dangerous to himself or others," thereby rendering the search and seizure of Zucker's person constitutional. In support of their excessive-force defense, the defendants pointed to the officers' testimony to establish that Zucker, whom they believed could be armed, was resisting, which justified the force that the officers used. The defendants argued that any of Zucker's testimony to the contrary was inadmissible because he was mentally incompetent at the time and therefore lacked the "competent personal knowledge" required by Federal Rule of Evidence 602.

In response, Zucker wrote a "counter-statement of facts" in which he maintained that the August 4, 2009, interaction, the

incident at the police station, and Ms. Zucker's conversation with the police dispatcher did not create probable cause to believe that Zucker was dangerous to himself or others. However, aside from asserting that no amount of force was necessary because there was no cause to believe that he was dangerous, Zucker never pointed to relevant parts of his own deposition testimony, which expressly contradicted the officers' account of the altercation in front of Zucker's apartment. Zucker stated only that when viewed in the light most favorable to him, the testimony of Officers Tiderington and Allen showed that "a reasonable officer in the position of these officers would have known that" the force they used to subdue him "violated [his] right to be free from excessive force."

Zucker did, however, observe that the Michigan Mental Health Code authorizes an officer to "take [an] individual into protective custody and transport the individual to a preadmission screening unit" if *the officer* "observes [the] individual conducting himself or herself in a manner that causes the peace officer to reasonably believe that the individual is a person requiring treatment."[1] Mich. Comp. Laws § 330.1427(1). By contrast, the FHPD has a policy that an officer may take someone into protective custody if "the officer *or another reliable person*" observes that the individual is a "person who requires treatment."

Though Zucker did not clarify the relevance of the discrepancy between FHPD policy and the Mental Health Code, the defendants responded in a reply brief that the officers' alleged violation of the Michi-

gan statute was irrelevant to the question of whether the seizure of Zucker was constitutional, since a violation of state law is not basis for a claim under 42 U.S.C. § 1983. An oral hearing before the district court failed to dispel the conflict about the relevance of the Mental Health Code. The parties did, however, clarify that Zucker was voluntarily waiving a number of his claims, including all state-law claims, a "due-process claim," and all claims against Chief Nebus.

After the hearing, the district court granted the defendants' motion for summary judgment. In a written ruling, the court agreed with the defendants that probable cause justified the officers' seizure of Zucker. The court observed that "[t]o the extent plaintiff disputes whether probable cause existed, it is not based on a disagreement over the facts. It is a disagreement over motives and perception." Viewed objectively, the facts could support but one conclusion, namely, that a reasonable officer would believe that the "plaintiff was a potentially violent threat to others, and that he was a potential threat to his own health and well-being due to the unhygienic state of his apartment." Turning to the excessive-force claim, the district court concluded that the force used by the officers was reasonable in light of the undisputed fact that "plaintiff was in relatively full control of his physical capabilities, and was actively resisting efforts to subdue him." Having found no underlying constitutional violation, the court dismissed Zucker's claim that Sergeant Michaluk was liable on a supervisory theory and also held that Zucker failed to show

---

1. The statute defines a "person requiring treatment" as including any person with a mental illness who, because of that illness, can "reasonably be expected within the near future to ... seriously physically injure himself, herself, or another," or whose inability to

"attend to ... his or her basic physical needs" or "understand his or her need for treatment" is reasonably expected to cause harm to the individual. Mich. Comp. Laws § 330.1401(1)(a)-(c).

that Farmington Hills had an unconstitutional policy.

Zucker then moved the court for various forms of relief pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)(6) and Eastern District of Michigan Local Rule 7.1(h) on the ground that the district court erred when it concluded that the officers had probable cause to search and seize Zucker. Zucker disputed some of the court's statements of fact related to his daughter's conversation with the police dispatcher and the state of Zucker's apartment, and, in reference to the Mental Health Code, argued that "nothing personally observed by any officer" established probable cause to believe that Zucker was a danger to himself or others. In passing, Zucker also stated that he had testified that officers had "employed force against Zucker while passive and in handcuffs." The district court denied Zucker's motion, suggesting that while the personal-observation requirement of the Mental Health Code may be relevant to a Fourteenth Amendment due-process claim, it was irrelevant to a civil-rights action alleging a violation of the Fourth Amendment.

### C

Zucker appeals the district court's denial of his post-judgment motion. On appeal, Zucker asserts that the district court committed four errors. First, Zucker argues that with all inferences taken in his favor, the facts show that the officers lacked probable cause to believe that he was a danger to himself or others. Appellant Br. 21–27. Second, Zucker argues that the district court failed to consider his own testimony when it dismissed his excessive-force claim. *Id.* at 27–29. Third, Zucker asserts that because FHPD policy does not conform to Section 427 of the Michigan Mental Health Code, Farmington Hills has a policy of violating constitutional rights.

*Id.* at 30–34. Lastly, Zucker argues that the district court misunderstood his counsel when counsel informed the district court that Zucker was no longer maintaining a count for a violation of due process. *Id.* at 34–36. We address each argument in turn.

## II. Standard of Review

### A

We begin by clarifying what is properly before this court on appeal. Zucker's notice of appeal formally appeals only the district court's order denying Zucker's post-judgment motion, in which Zucker asked the court to vacate and reconsider its December 2014 order granting the defendants' motion for summary judgment. However, because "[a]n appeal from a timely-filed Rule 59 motion also brings before the appellate court the underlying judgment," *Hood v. Hood,* 59 F.3d 40, 43 n. 1 (6th Cir.1995) (per curiam), we review the district court's decision to grant the defendants' motion for summary judgment as well. We proceed by summarizing the standard that governs our review of the two district-court orders on appeal before turning to the merits of Zucker's arguments.

### B

A district court may grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). This court reviews a district court's decision to grant or deny summary judgment de novo. *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 619 (6th Cir.2006). In an appeal from a decision granting summary judgment to a party, we consider the evidence and "all inferences drawn therefrom" in favor of the

non-moving party. *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir.2000). However, the mere existence of an alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment" so long as there is no "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Our review of Zucker's post-judgment motion is more nuanced. A district court may grant relief under Rule 59(e) for any of four reasons: "(1) because of an intervening change in the controlling law; (2) because evidence not previously available has become available; (3) to correct a clear error of law; or (4) to prevent manifest injustice." *Hayes v. Norfolk S. Corp.,* 25 Fed.Appx. 308, 315 (6th Cir.2001). Though Rule 59(e) relief is rare, relief under Rule 60(b) is even more extraordinary. Rule 60(b)(6), which Zucker invoked in the district court, permits courts to relieve a party from final judgment only in "unusual and extreme situations where principles of equity *mandate* relief." *Olle v. Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir.1990). Lastly, in order to establish grounds for reconsideration under Local Rule 7.1(h), a movant must "demonstrate a palpable defect by which the court and the parties ... have been misled" and also "show that correcting the defect will result in a different disposition of the case." E.D. Mich. Local R. 7.1(h)(3); *In re Greektown Holdings, LLC,* 728 F.3d 567, 574 (6th Cir.2013).

Where, as here, the order underlying the district court's decision involved a grant of summary judgment, we ordinarily review de novo the court's denial of relief under Rule 59(e) and Local Rule 7.1(h). *Indah v. SEC,* 661 F.3d 914, 924 (6th Cir.2011); *Med. Mut. of Ohio v. k. Amalia Enters. Inc.,* 548 F.3d 383, 389–90 (6th

Cir.2008). However, "[a] district court's refusal to consider evidence for the first time on [these motions] will be reversed only if the refusal constitutes an abuse of discretion." *Sommer v. Davis,* 317 F.3d 686, 691 (6th Cir.2003). We review the denial of a Rule 60(b) motion for abuse of discretion. *Jinks v. AlliedSignal, Inc.,* 250 F.3d 381, 385 (6th Cir.2001).

### C

The individual officer defendants have invoked qualified immunity, which modifies what Zucker must show in order to defeat their motion for summary judgment. In order to provide officers "breathing room to make reasonable but mistaken judgments," *Stanton v. Sims,* —— U.S. ——, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (per curiam) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011)), officers enjoy protection from actions seeking civil damages such as this one so long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). For an official to have known that his actions would violate "clearly established" law, "existing precedent must have placed the statutory or constitutional question beyond debate." *al–Kidd,* 131 S.Ct. at 2083. The "clearly established" standard involves two questions: First, whether the relevant officer violated the plaintiff's statutory or constitutional rights. *Hagans v. Franklin Cty. Sheriff's Office,* 695 F.3d 505, 508 (2012). Second, whether the right in question was clearly established at the time of the alleged violation. *Ibid.* When analyzing whether an officer has violated clearly established law, courts have discretion in

deciding which of the two questions to address first "in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236, 129 S.Ct. 808. When a defendant invokes qualified immunity, the plaintiff must prove that the defendant is not entitled to qualified immunity. *Davenport v. Causey,* 521 F.3d 544, 550 (6th Cir.2008). Nevertheless, we must construe all facts in the light most favorable to the plaintiff and must make all reasonable inferences in his favor. *Ibid.*

### III. Probable Cause

It is well established that absent suspected criminal activity, a law-enforcement agent may not seize a person simply in order to assess his mental fitness. *McKenna v. Edgell,* 617 F.3d 432, 440 (6th Cir.2010); *Fisher v. Harden,* 398 F.3d 837, 842 (6th Cir.2005). As we explained in *Monday v. Oullette,* 118 F.3d 1099 (6th Cir.1997), the Fourth Amendment protects individuals from state-sanctioned detention for a psychiatric evaluation absent "probable cause to believe that the person is dangerous to himself or others." *Id.* at 1102. In this context, a showing of probable cause "requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Ibid.* (quoting *Illinois v. Gates,* 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). When examining whether officers had probable cause to believe that an individual posed a danger, we have cautioned that "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts," *ibid.* (quoting *Gates,* 462 U.S. at 232, 103 S.Ct. 2317), requiring courts to evaluate the facts known to officers from the perspective of a "reasonable and objective person" in those officers' position, *Fisher,* 398 F.3d at 843. Zucker makes two arguments that officers seized him without probable cause in violation of the Fourth

Amendment. As we explain, neither is availing.

### A

Zucker first argues that his daughter's conversations with the dispatcher and officers could not support a reasonable belief that he posed a danger to himself or others. Appellant Br. 21–27. Emphasizing that Ms. Zucker "told police [that Zucker] doesn't threaten her," *id.* at 6, Zucker argues that it was plain to officers that his daughter was frightened and alarmed simply because she had never before seen a gun, not because Zucker posed a danger to anyone, *see id.* at 25–26. Because Zucker's account of his daughter's report to officers draws selectively from the evidence before the district court and is clearly inconsistent with what that record shows transpired, we disagree.

We have confronted probable cause in the context of mental-health seizures in a number of cases, three of which are particularly instructive here. In *Fisher v. Harden,* 398 F.3d 837 (6th Cir.2005), police received a call from a passerby who reported that a man in the distance appeared to have tied himself to railroad tracks in an attempt to take his own life. *Id.* at 839–40. The police approached the man, who turned out to be Fisher, and observed him sitting in a folding chair with a rifle, where he had positioned himself in order to shoot groundhogs. *Id.* at 840. We rejected the officers' argument that they had probable cause to detain Fisher, reasoning that because Fisher was not tied to the railroad tracks, appeared to be hunting, and approached the police in an entirely ordinary manner, the police had no evidence that Fisher was a danger other than discredited information from an obviously unreliable informant. *Id.* at 843–44.

By contrast, in *Monday,* Monday dialed a mental-health hotline and reached a psychologist, whom he informed that he had ingested a particular prescription medication, was drinking alcohol, and "could have cared less" that doing so while taking the medication was potentially fatal. *Monday,* 118 F.3d at 1101. The psychologist informed the police that Monday may have overdosed on the medication in an attempt to commit suicide. *Ibid.* The police arrived at Monday's residence, found that at least twenty of his pills were missing from a recently issued prescription bottle, and observed that he was intoxicated. *Ibid.* Although Monday denied having overdosed, we concluded that the officers' observations, in the context of the psychologist's report, created probable cause to believe that Monday's life was in danger. *Id.* at 1102–03; *see also Ziegler v. Aukerman,* 512 F.3d 777, 783–84 (6th Cir.2008).

*Simon v. Cook,* 261 Fed.Appx. 873 (6th Cir.2008), helps to clarify the line we have drawn between Fisher and Monday. Simon called the Lexington Police Department to report that government officials had been harassing him. *Id.* at 874. The police responded, and the situation escalated after officers expressed doubts about Simon's "bizarre and improbable" story that various government officers and agencies were conspiring to attack and kill him. *Id.* at 880. An officer detained Simon after Simon nearly struck him in the face and stated: "[H]ow would you like it if I followed you around?" *Ibid.* We emphasized that probable cause "requires only a 'probability or substantial chance,' " *id.* at 881 (quoting *Monday,* 118 F.3d at 1102), and found that the officers reasonably concluded that Simon posed a danger since he nearly made physical contact with an officer and "intimated that he intended to follow police officers," *id.* at 880.

Here, the information that the officers had indicated a greater and far more immediate danger than did the information that the police had in *Simon.* First, whatever Ms. Zucker's subjective motivations or fears may have been, no reasonable person could infer that she was saying anything other than that Zucker posed a danger to himself and others around him. Ms. Zucker emphatically told the dispatcher not to tell Zucker that she had called "because my life is on the line." She also told the dispatcher that Zucker was "in a manic state" and was suffering from "delusional symptomology." *Ibid.* Ms. Zucker expressed that she was "afraid to go back in the apartment" and explained that she "went running out the door" because she was "scared." She also intimated that Zucker would be capable of violence if confronted, stating: "I don't want anyone else getting injured. I don't want the cops getting injured." Although Zucker claims that his daughter was scared simply because she had "never seen in [her] life a gun ... up until this moment," a reasonable person who heard her statement *in context* could not but conclude that she was scared not merely because Zucker had a gun, but rather because he produced a gun after "something triggered something," sending him into a "delusional" and "manic" state.

Moreover, Ms. Zucker's conversation with the dispatcher was not the only evidence available to police. Cole, who stated that he had been inside Zucker's unit earlier in the day, told the dispatcher that Zucker was "totally unstable" and that Ms. Zucker had told Cole that Zucker's "gun is out." It is uncontested that once officers arrived, Zucker's daughter told Officer Tiderington that "she was concerned about her father's mental state," that Zucker's "apartment was in disarray," and that "she observed him walking around with a gun." Officer Tiderington could confirm Ms.

Zucker's and Cole's reliability based on his own experience with Zucker: Nearly two weeks prior to the incident, Officer Tiderington had spoken with Zucker and had come away with the impression that Zucker suffered from a mental illness. Although Zucker argued to the district court that the "disarray" that Tiderington observed was due to an invader, not Zucker, Zucker offered nothing to contest Tiderington's testimony that Zucker's own demeanor on August 4 caused Tiderington to believe that Zucker might be ill.

Tiderington's visit to Zucker's apartment reasonably raised the officers' suspicions about whether Zucker was mentally sound. When coupled with the alarmed reports from Ms. Zucker and Cole that Zucker was in a manic, delusional state and had produced a firearm, we agree with the district court that a reasonable officer would have found a "probability" that Zucker would engage in dangerous behavior. *Monday,* 118 F.3d at 1102 (quoting *Gates,* 462 U.S. at 243 n. 13, 103 S.Ct. 2317).

## B

On appeal, Zucker also argues that officers lacked probable cause to seize him because they violated state law. In an apparent reference to the Mental Health Code, Zucker suggests that the district court erred by making a "finding of probable cause based not on any officer observation, as required by statute." Appellant Br. 23. In his view, officers could not have taken Ms. Zucker's or Cole's observations into consideration when making their probable-cause determination, since the Mental Health Code states that an officer can take a person into protective custody if *the officer himself* "observes [the] individual conducting himself or herself in a manner that causes the peace officer to reasonably believe that the individual is a person requir-

ing treatment," Mich. Comp. Laws § 330.1427(1). *See* Appellant Br. 23. Zucker intimates that without the observations of third parties, the officers would have had no reason to believe that he was dangerous. *See id.* at 24, 26.

Zucker's argument fails because we have repeatedly held that a plaintiff cannot allege a violation of state law in an action under 42 U.S.C. § 1983. *See, e.g., Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir.1995) ("While the states are, of course, free to enact laws that are more protective of individual rights than the United States Constitution, a mere violation of such a state law will not establish a proper claim under § 1983." (quoting *Conley v. Williams,* No. 93–5524, 1994 WL 326001, at \*2 (6th Cir. July 5, 1994))); *see also United States v. Beals,* 698 F.3d 248, 263 (6th Cir.2012) ("While the states are free to impose rules for searches and seizures that are more restrictive than the Fourth Amendment, those rules will not be enforced in a federal criminal proceeding."). Nothing in the Fourth Amendment prohibits an officer from relying on a third party's observation when ascertaining whether probable cause to conduct a seizure exists, so long as it would be reasonable to conclude that. the third party is reliable. *See, e.g., Boykin v. Van Buren Township,* 479 F.3d 444, 450 (6th Cir.2007); *see also, e.g., Ziegler,* 512 F.3d at 783–84.

Zucker counters that in *Fitzgerald v. Santoro,* 707 F.3d 725 (7th Cir.2013), the Seventh Circuit stated that "[p]robable cause exists 'only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" *Id.* at 732 (quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992)). The *Fitzgerald* court went on to explain that "[i]n Illinois, the governing legal standard is 405 [Ill. Comp. Stat.] 5/3–606," a provision of the Illinois Mental

Health and Developmental Disabilities Code. *Ibid.* While *Fitzgerald* may at first blush seem to give support for Zucker's argument, the phrase "governing legal standard" simply refers to the danger that the seizure seeks to avoid, not the manner in which state officials obtain the information that establishes probable cause to believe that the danger will occur. This is evidenced in the Seventh Circuit's steadfast rejection of the very argument that Zucker makes here. *See, e.g., Chathas v. Smith,* 884 F.2d 980, 987 (7th Cir.1989); *McKinney v. George,* 726 F.2d 1183, 1188–89 (7th Cir.1984). Most recently, in *Bruce v. Guernsey,* 777 F.3d 872 (7th Cir.2015), the court rejected a civil-rights plaintiff's argument that officers' violation of a personal-observation requirement in the mental-health-seizure provision of the Illinois Mental Health and Developmental Disabilities Code constituted a violation of the Fourth Amendment. *Id.* at 876. The panel explained that "the constitutionality of a mental-health seizure does not depend on whether the officer met each requirement spelled out by state law." *Ibid.* On the contrary, "a violation of the Illinois Mental Health and Developmental Disabilities Code does not constitute a *per se* violation of the Fourth Amendment. Our task instead is to see whether [officers] had probable cause to believe that [the plaintiff] needed immediate hospitalization because she was a danger to herself or others." *Ibid.* Our task is no different, and nothing in *Fitzgerald* changes our analysis.

## IV. Excessive Force

In addition to the district court's conclusion that the officers had probable cause to search and seize Zucker, Zucker takes issue with the district court's holding that the officers did not use excessive force against him. *See* Appellant Br. 28–29. Before resolving Zucker's argument, we must first ascertain what evidence the district court was required to consider before it granted the defendants' motion for summary judgment as to Zucker's excessive-force claims.

### A

In his appellate brief, Zucker points to his own deposition testimony and sets forth facts that do raise a material issue of fact as to whether the officers used excessive force:

> When Plaintiff exited his apartment, he closed the door behind him, and saw Tiderington bounding up the stairs. The officer then, without word or warning, "comes alongside me, locks arms with me and pulls me to the ground and handcuffs me." Then Tiderington searched Plaintiff and asked if he had a gun, to which Plaintiff responded affirmatively. Tiderington then took Plaintiff's keys and without permission or warrant, made entry into Plaintiff's apartment, leaving Plaintiff on the ground. According to Plaintiff, while he remained handcuffed behind his back, laying on the ground face up, officer Tomasovich–Morton came up the stairs and executed a knee-drop on his chest. Plaintiff was in terrific pain and fearing impending death, began to recite the Shma Yisroel creed when Officer Allen appeared and began tasing Plaintiff repeatedly.

*Id.* at 8–9 (citations omitted). If Officer Tiderington had detained Zucker and if Zucker had stopped resisting and did not pose a threat to himself or anyone else, Officer Tomasovich–Morton's "knee-drop" maneuver and Officer Allen's act of shocking Zucker repeatedly with a taser would raise serious questions about the constitutionality of the force officers used. Indeed, we have held that striking or shocking a non-resisting detainee violates the

Fourth Amendment. *See, e.g., Thomas v. Plummer,* 489 Fed.Appx. 116, 125–27 (6th Cir.2012); *Landis v. Baker,* 297 Fed.Appx. 453, 462–63 (6th Cir.2008).

The problem is that Zucker never brought his testimony to the attention of the district court in his opposition to the defendants' motion for summary judgment. In his response below, Zucker did not attach the portions of his own testimony that explained his account of how officers physically detained him on August 13, 2009. Nor did he cite to, summarize, or describe that testimony in his memorandum in opposition. Instead of citing his own deposition testimony that he was "on the floor ... like a beached whale" when attacked by Officers Tomasovich–Morton and Allen, Zucker chose to argue that Officer Tiderington's and Officer Allen's own testimony showed that the defendants used excessive force.

The defendants stated that Zucker's "testimony does not create a genuine issue of fact" on the issue of excessive force because he was "judged to be mentally incompetent at the time of this incident" and "does not, therefore, have competent personal knowledge of [the events], as required by [Federal Rule of Evidence] 602." Zucker could have set forth his own version of the facts or responded that his testimony would be admissible at trial; his decision not to do either gave the district court discretion to decline to consider Zucker's testimony. *See* Fed.R.Civ.P. 56(e)(2). Because "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact,'" *Guarino v. Brookfield Twp. Trs.,* 980 F.2d 399, 404 (6th Cir.1992) (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1480 (6th Cir.1989)), the district court's failure to consider Zucker's testimony was not error. And because our review of the district

court's grant of summary judgment to the defendants is limited to the evidence that the parties brought to the district court's attention, *see Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.,* 409 F.3d 342, 346 (6th Cir.2005); *Bush v. Rauch,* 38 F.3d 842, 846 (6th Cir.1994), we may not consider Zucker's testimony as it relates to the excessive-force claim.

We recognize that in his post-judgment motion, Zucker cited to his deposition testimony to support his contentions that "Zucker denies having had any conversation with Officer Tiderington at his front door prior to being taken to the ground and handcuffed. Zucker was handcuffed immediately. Tomosovich–Morton [sic] appeared before Allen and employed force against Zucker while [Zucker was] passive and in handcuffs." However, Zucker's effort to create a dispute of fact was too little, too late. For one, Zucker's post-judgment motion focuses on the district court's probable-cause determination, not the court's conclusion that officers did not use excessive force against him. For another, it is "well established" that Rule 59(e) relief is not warranted "when [a motion] is premised on evidence that the party had in his control prior to the original entry of judgment." *Emmons v. McLaughlin,* 874 F.2d 351, 358 (6th Cir. 1989). The same goes for motions made pursuant to Rule 60(b)(6) and Local Rule 7.1(h). *See Newburgh/Six Mile Ltd. P'ship II v. Adlabs Films USA, Inc.,* 483 Fed.Appx. 85, 94–95 (6th Cir.2012); *Mich. Dep't of Soc. Servs. v. Sullivan,* No. 91– 1995, 1992 WL 88972, at *4–5 (6th Cir. 1992) (per curiam). Because Zucker did not clearly raise the issue of excessive force in his post-judgment motion, and had access to his own testimony before filing his opposition to the defendants' motion for summary judgment, the district court did not err by declining to consider that testimony. Accordingly, we must examine

the district court's excessive-force rulings in light of the evidence that the parties adverted to in their summary-judgment briefing.

## B

Having clarified what evidence the district court was required to consider, we turn to the issue of whether that evidence created a material dispute regarding officers' alleged use of excessive force against Zucker. In the district court, Zucker alleged that officers used excessive force against him in two ways. First, Zucker argued that Officer Tiderington used excessive force when he forcibly detained Zucker, which he did by grabbing Zucker's arm and bringing Zucker to the floor. Second, Zucker argued that Officer Allen used excessive force when he shocked Zucker with a taser. Because Zucker's opposition to the defendants' motion for summary judgment never mentioned—and the district court never considered—Officer Tomasovich–Morton's knee-drop maneuver, we may not now consider it on appeal. *See Meridian Leasing*, 409 F.3d at 346; *Bush*, 38 F.3d at 846.

### i

Officers may use reasonable force in order to effectuate a seizure. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The reasonableness of a particular seizure must be evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Ibid.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). A number of factors may be relevant, including "whether the [individual] poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight." *Ibid.* The Supreme Court has cautioned that courts must take care to avoid ignoring context when conducting the analysis: " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Ibid.* (citation omitted) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). Rather, the governmental interests at stake must be evaluated through the lens of "an officer on the scene making split-second judgments and without the advantage of 20/20 hindsight." *Goodrich v. Everett*, 193 Fed.Appx. 551, 555 (6th Cir.2006).

In this case, Officer Tiderington met Zucker in front of his apartment, explained that Zucker's daughter was concerned, and asked Zucker to come with the officers to the hospital. Zucker then moved his hands toward his jacket pockets and turned to enter his apartment. With information from Ms. Zucker and Cole that Zucker was armed, manic, and unstable, Tiderington interpreted Zucker's behavior as an attempt to reach for his gun and grabbed Zucker's arm to prevent him from leaving, causing both men to fall to the floor.

Tiderington's decision to grab Zucker and—assuming that the fall was intentional—bring him to the floor did not violate the Fourth Amendment. Although a "totally gratuitous blow with a policeman's nightstick may cross the constitutional line," *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988), our precedents make clear that an officer may grab or tackle an individual whom the officer reasonably suspects may be "capable of violence." *Goodrich*, 193 Fed.Appx. at 557; *see also, e.g., Wysong v. City of Heath*, 260 Fed. Appx. 848, 854–55 (6th Cir.2008). We have already explained that officers reasonably believed that Zucker posed a danger to

himself or others. In particular, Officer Tiderington had reason to believe that Zucker was mentally unstable—as Ms. Zucker put it, he was in a "manic" and "delusional" state—and that he had a gun that his daughter intimated he would use against officers. In this context, the danger to officers if Zucker obtained his gun, either from his jacket or from inside his apartment, was great, and Officer Tiderington's decision to grab Zucker to avoid the possibility that he would retrieve the weapon was reasonable. While tackling an individual who is compliant and not actively resisting could well constitute excessive force, *see, e.g., Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir.2006), no precedent directs the same result where, as here, the detainee is not compliant and is reasonably suspected of violent behavior.

ii

Similarly, we cannot conclude that Officer Allen's use of a taser to shock Zucker violated clearly established law. *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505 (6th Cir.2012), informs our analysis. In *Hagans*, an unarmed but enraged man who had smoked crack cocaine charged toward an officer before attempting to enter a police cruiser. *Id.* at 507; *Hagans v. Franklin Cty. Sheriff's Office*, No. 2:08–CV–850, 2011 WL 2173696, at *8 (S.D.Ohio June 2, 2011). Two officers wrestled Hagans to the ground but could not manage to cuff his hands, since he "lay down on the pavement and locked his arms tightly under his body, kicking his feet and continuing to scream." *Hagans*, 695 F.3d at 507. Seeing that Hagans was continuing to actively resist, a third officer shocked Hagans four to six times until officers finally subdued him. *Ibid.* These facts presented the question of whether "it was clearly established in May 2007 that using a taser repeatedly on a suspect actively resisting arrest and refusing to be handcuffed amounted to excessive force." *Id.* at 509.

In answering this question, we observed a line in the case law that separated suspects who actively resisted arrest from those who did not: We had previously held that the use of a taser to subdue an individual who actively resisted arrest did not constitute excessive force. *See Caie v. West Bloomfield Township*, 485 Fed.Appx. 92, 94 (6th Cir.2012); *Williams v. Sandel*, 433 Fed.Appx. 353, 354, 362–63 (6th Cir. 2011). By contrast, officers who had used a taser against an individual who was either compliant or who had stopped resisting did violate the Fourth Amendment. *See Kijowski v. City of Niles*, 372 Fed. Appx. 595, 600–01 (6th Cir.2010); *Landis v. Baker*, 297 Fed.Appx. 453, 464 (6th Cir. 2008); *cf. Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir.2004) (holding that officers used excessive force by using pepper spray against a suspect who was immobilized and had stopped resisting). On the basis of this distinction, we concluded that the officer in *Hagans* did not violate clearly established law as of 2007. *Hagans*, 695 F.3d at 511.

The analysis that governed the outcome in *Hagans* also governed in 2009, when officers shocked Zucker in an effort to subdue him. *See Caie*, 485 Fed.Appx. at 96. Indeed, this court continues to draw a distinction between the use of force against a resisting suspect, which is generally permissible, and the use of force against a suspect who is compliant or has stopped resisting, which is not. *See, e.g., Gradisher v. City of Akron*, 794 F.3d 574, 585–86 (6th Cir.2015); *Thomas*, 489 Fed. Appx. at 126–27. Accordingly, Officer Allen did not violate clearly established law so long as Zucker was actively resisting when Allen shocked Zucker with the taser. Such was the case here.

As explained above, Zucker failed to timely inform the district court that he disputed the defendants' assertion that he was struggling against Tiderington after the two fell to the ground. The testimony of Officers Tiderington and Allen makes clear that Allen shocked Zucker while Zucker continued to resist detention. Because Zucker's summary-judgment briefing did not state facts that contradicted the defendants' account of events or support such facts by pointing to specific material in the record, and failed to show that the statements of Officers Tiderington and Allen could reasonably be read to show a constitutional violation, *see* Fed.R.Civ.P. 56(c), we find no error in the district court's conclusion that Officer Allen did not violate clearly established law when he deployed his taser against Zucker. And because Zucker agrees that his supervisory-liability claims against Sergeant Michaluk must fail if the individual officers are not liable, *see* Appellant Br. 30, we find no error in the district court's grant of summary judgment to Sergeant Michaluk either.

## V. Municipal Liability

Invoking *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Zucker also contends that the district court erred when it determined that he could not maintain his claim against the City of Farmington Hills. Appellant Br. 30. Zucker argues that the City of Farmington Hills has an official "policy" that violates the "rights to be free from unreasonable seizure, force and search," *id.* at 31, and that this policy caused him to be seized in violation of the Fourth and Fourteenth Amendments, *id.* at 30–31. He also intimates that this policy amounts to a failure to train officers. *Id.* at 31.

To succeed on a claim that a municipality has a policy or practice of constitutional violations, a plaintiff must identify an unconstitutional policy and must show that the policy led to a constitutional deprivation. *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir.2015); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.1993); *see also City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" (second alteration in original) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)). Although municipalities do not enjoy qualified immunity, *Meals v. City of Memphis*, 493 F.3d 720, 727 (6th Cir.2007), there is no liability under *Monell* without an underlying constitutional violation, *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir.2014).

The "moving force behind" Zucker's claim is that "the City [of Farmington Hills] had, and continues to have, a policy that misquotes the [Michigan] Mental Health Code," which led to the deprivation of his rights under the Fourth and Fourteenth Amendments. Appellant Br. 31. As explained above, however, nothing in the Fourth Amendment prohibits an officer from relying on a third party's observations when ascertaining whether probable cause to conduct a seizure exists, so long as reliance on that third party is reasonable. *See, e.g., Boykin*, 479 F.3d at 450. Although states may restrict state and local officers' conduct in a way that goes beyond what the Fourth Amendment requires, their decision to do so does not expand the Fourth Amendment in a way that would transform a violation of state law into a violation of the Fourth Amendment. *See, e.g., Beals*, 698 F.3d at 263. Because Zucker has failed to show how the discrepancy between the Farmington Hills policy and the Mental Health Code in any

way changes how the Fourth Amendment should apply, and does not assert that the FHPD policy represents a deprivation of a state-created liberty interest, the district court did not err when it granted the defendants' motion for summary judgment as to Zucker's *Monell* claim.

### VI. Due–Process Claim

In his appellate brief and a subsequent motion, Zucker argues that this court should remand the case so that the district court may consider a due-process claim that he purportedly raised in his post-judgment motion. *See* Appellant Mot. to Remand 14; Appellant Br. 34–36. Zucker notes that in Count IV of his complaint, he argued that the individual defendants were liable under 42 U.S.C. § 1983 because they violated his "right not to be deprived of liberty or property without due process of law, as secured by the 4th and 14th Amendments to the Constitution of United States of America." In response to the defendants' motion for summary judgment, however, Zucker made no mention of due process.

Without any indication that Zucker intended to bring a due-process claim that was distinct from his claim that the defendants violated his Fourth Amendment rights, the court asked Zucker's counsel about a due-process claim in an oral hearing: "[Y]ou alleged a violation of due process and Defendants argued that that must also be dismissed for various legal reasons. Are you still maintaining a count for violation of due process, and if so, which one is it and where is it? And take your time." Zucker's counsel responded in the negative:

> COUNSEL: Your Honor, respectfully the 42 U.S. [sic] 1983 claims contained within them, the excessive force, which would be the 4th and 14th unlawful seizure and unlawful search, so I think that

would also knock out the assault and battery, the state claims, and it would be duplicative.

> THE COURT: Yes.

> COUNSEL: And the due process, I think, so as not to complicate things for the jury may also be disposed in that manner.

Later in the oral hearing, the court returned to the issue to clarify what Zucker was alleging in Count IV of his complaint. Zucker's attorney did not mention a violation of due process. Based on the colloquy at the oral hearing, as well as Zucker's failure to explain a distinct due-process claim in his opposition to the defendants' motion for summary judgment, the district court determined that Zucker had waived any such claim.

Zucker now argues that because his counsel misunderstood what the court meant when it asked if Zucker was dismissing "a count for violation of due process," counsel could not have waived the argument. In particular, Zucker argues that his attorney mistakenly believed that the district court was referring to a due-process claim that Zucker brought in a separate state-court action against the hospital where Zucker was committed.

The contours of the "due-process claim" that Zucker seeks to make remain hazy. As Zucker's counsel explained in an affidavit submitted to this court, the claim hinges on the discrepancy between FHPD policy and the Mental Health Code. *See* Appellant Mot. to Remand, Ex. 1 at 7. In *Wise v. Wilburn*, No. 07–CV–15479, 2009 WL 2222606 (E.D.Mich. July 20, 2009), which Zucker suggests forms the basis for his due-process claim, the court stated that officers may, consistent with the Fourth Amendment, "lawfully seize a person within his home without a warrant and detain him for psychiatric evaluation on finding probable cause to believe that

the individual poses a 'probability or substantial chance' of dangerous behavior to himself or others." *Id.* at *1 (quoting *Monday*, 118 F.3d at 1102). The court went on to explain that "[u]nder the Fourteenth Amendment Due Process Clause, police officers may lawfully seize a person without a warrant for purposes of mental health evaluation based on reasonable grounds to believe that the person is subject to seizure under the governing legal standard." *Ibid.* (citing *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir.1993)). Drawing on the *Wise* court's statement of the law, Zucker argues that the analysis of mental-health seizures under the Fourth Amendment is substantively different from the analysis of mental-health seizures under the Fourteenth Amendment, and posits that he can succeed under the latter.

■ Though we harbor doubts about the merits of this argument, *see generally Pino v. Higgs*, 75 F.3d 1461, 1469 (10th Cir.1996) (explaining contours of the Fourth and Fourteenth Amendments in cases involving mental-health seizures), we need not consider it now because Zucker forfeited his due-process claim by failing to explain or support it in the district court before the court entered judgment in favor of the defendants.

Even if we ignore Zucker's counsel's statement that Zucker was voluntarily dismissing a due-process claim, we cannot ignore the "well-settled" rule that parties ordinarily forfeit for appellate review any claims that they failed to properly raise in the district court. *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552–53 (6th Cir.2008). Consistent with this general rule, we do not ordinarily consider an argument on appeal where a plaintiff, after being given the opportunity to do so, "fails to present [his] argumen[t] to the district court in opposition to a defendant's motion for summary judgment." *Davis v. Lucent Techs., Inc.*, 251 F.3d 227, 232 (1st Cir.2001); *accord Lahar v. Oakland County*, 304 Fed.Appx. 354, 356 (6th Cir.2008). Because Zucker could have, but did not, articulate a distinct due-process claim before the district court's entry of judgment, the district court did not err when it granted summary judgment in favor of the defendants. *See Schwab v. Huntington Nat'l Bank*, 516 Fed.Appx. 545, 552 (6th Cir.2013).

Nor did the district court err when it denied Zucker's post-judgment motion without considering his due-process claim. It is also "well-settled" law in this circuit that "parties cannot use a motion for reconsideration to raise new legal arguments that could have been raised before a judgment was issued." *Bank of Ann Arbor v. Everest Nat'l Ins. Co.*, 563 Fed.Appx. 473, 476 (6th Cir.2014) (quoting *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir.2007)). And "[n]ew arguments based on hindsight regarding how a movant would have preferred to have argued its case do not provide grounds for Rule 60(b) relief." *Westport Ins. Corp. v. Goldberger & Dubin, P.C.*, 255 Fed.Appx. 593, 595 (2d Cir.2007). Since Zucker did not properly raise the due-process claim before the entry of judgment against him, we find no error in the district court's disposition of his post-judgment motion. *See, e.g., Bank of Ann Arbor*, 563 Fed.Appx. at 476; *Marietta Franklin Sec. Co. v. Muldoon*, No. 93–3432, 1994 WL 399550, at *4 (6th Cir. Aug. 1, 1994) (per curiam).

Zucker seeks to avoid the consequences of forfeiture by contending that the defendants' motion for summary judgment was in fact a motion for partial summary judgment because it did not explicitly mention a due-process claim. *See* Appellant Mot. to Remand 8. On Zucker's view, he thus

had no obligation to raise the due-process claim in his response in opposition to the motion. *Ibid.* But Zucker ignores the fact that the defendants' motion stated without qualification that Zucker's federal claims lacked merit. And since the Supreme Court has held that if "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing th[e] claims," *County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion)); *see also Ziegler,* 512 F.3d at 786–87, the defendants reasonably understood that Count IV of Zucker's complaint would be governed by the Fourth Amendment analysis that they set forth in their motion for summary judgment. *Cf. Doe ex rel. Thomas v. Tsai,* 648 F.3d 584, 587 (8th Cir.2011) ("We reject the Appellants' contention that the Appellees failed to move for summary judgment on all of the Appellants' claims.... Although we agree with the Appellants that Sergeant Pickhardt did not argue that summary judgment was appropriate on the children's Fourth Amendment search claims, this absence is logical because it is unclear from the Appellants' complaint whether they assert a Fourth Amendment search claim against Sergeant Pickhardt...."). Because nothing in Zucker's complaint or briefing indicated that Zucker meant anything else—and because nothing in the defendants' motion suggested that the defendants sought anything other than summary judgment on all of Zucker's claims—Zucker was not relieved of his obligation to articulate the due-process claim in his response in opposition.

This leaves the question of whether this court may consider the due-process claim for the first time on appeal. Although we have held that "absent a legitimate excuse," an argument that is not properly raised in the district court is ordinarily forfeited for appellate review, *United States v. Huntington Nat'l Bank,* 574 F.3d 329, 331 (6th Cir.2009), this rule is "one of prudence ... and [is] not jurisdictional," *Coffee Beanery, Ltd. v. WW, L.L.C.,* 300 Fed.Appx. 415, 419 (6th Cir.2008) (alterations in original) (quoting *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 159 (2d Cir.2003)). Nonetheless, we have only "rarely exercised" discretion to consider new claims on appeal and decline to do so here, where the parties have not extensively briefed the merits of the claim. *Scottsdale Ins. Co.,* 513 F.3d at 552.

## VII

Maintaining an untidy apartment is not by itself grounds for probable cause to search and seize a person. Nor does the mere fact that an individual is a gun owner justify the use of force against him. In Zucker's case, however, officers had far more cause for concern than these two facts. Because the evidence submitted to the district court shows that the officers had reliable evidence that Zucker had a weapon while in a delusional state, officers had probable cause to temporarily detain, search, and seize Zucker. Similarly, because Zucker failed to allege facts that would create a genuine dispute about whether he was actively resisting the officers' efforts to subdue him, the district court did not err when it held that Zucker cannot overcome qualified immunity and maintain his excessive-force claims.

For these reasons, we AFFIRM the judgment of the district court.